FILED

17 JAN 23 PM 4:13

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY:                          DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WALDO RENE MEDINA,<br><br>                           Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of Social Security,<br>                         Defendant. | Case No.:  16cv215-GPC(KSC)<br><br>**REPORT AND RECOMMENDA-<br>TION RE:**<br><br>**(1) CROSS-MOTIONS FOR<br>SUMMARY JUDGMENT [Doc. Nos.<br>26 and 32];**<br><br>**(2) DEFENDANT'S MOTION TO<br>DISMISS [Doc No. 25];**<br><br>**(3) PLAINTIFF'S MOTION TO<br>EXCLUDE EVIDENCE [Doc. No. 30];<br>AND**<br><br>**(4) PLAINTIFF'S EX PARTE<br>REQUEST TO SUPPLEMENT THE<br>RECORD [Doc. No. 28]** |

16cv215-GPC(KSC)

Pursuant to Title 42, United States Code, Section 405(g), of the Social Security Act ("SSA"), plaintiff filed a Complaint to obtain judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying him disability insurance benefits.[1]  [Doc. No. 1.]  Although plaintiff was represented by counsel while his disability claim was pending before the Commissioner, he is unrepresented in this action and is proceeding *in forma pauperis*.[2]  [Doc. No. 6.]

Presently before the Court are: (1) defendant's Motion for Involuntary Dismissal [Doc. No. 25]; (2) defendant's Motion for Summary Judgment [Doc. No. 26]; (3) plaintiff's Ex Parte Request to Supplement the Administrative Record [Doc. No. 28]; (4) plaintiff's Motion to Exclude Evidence [Doc. No. 30]; (5) plaintiff's Motion for Summary Judgment [Doc. No. 32]; (6) defendant's Response to plaintiff's Motions [Doc. No. 33]; (7) plaintiff's Response to defendant's Motion for Summary Judgment; and (8) the Administrative Record ("AR") [Doc. No. 10].

After careful consideration of the moving and opposing papers, as well as the Administrative Record and the applicable law, it is RECOMMENDED that the District Court affirm the ALJ's decision to deny benefits by issuing an order DENYING defendant's Motion for Involuntary Dismissal; GRANTING defendant's Motion for Summary Judgment; DENYING plaintiff's Motion for Summary Judgment; DENYING

---

[1]   Title 42, United States Code, Section 405(g), provides as follows: "Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action . . . brought in the district court of the United States. . . .  The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).

[2]   District Courts are obligated to afford a certain amount of leeway to *pro se* litigants and to construe their pleadings liberally. *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010).

1  plaintiff's Motion to Exclude Evidence; and DENYING plaintiff's Ex Parte Request to

2  Supplement the Administrative Record.

3  *I.*   ***Background and Procedural History***.

4         On December 9, 2011, plaintiff applied for disability benefits claiming he was

5  unable to work as of August 10, 2002. [AR 180-181.] At this time, plaintiff reported that

6  he lived in a home or apartment and did not need help with personal care, hygiene,

7  upkeep of a home, or cooking. [AR 185.]

8         On January 23, 2014, plaintiff was notified that his application had been reviewed,

9  but he did not qualify for disability benefits because his medical condition was not severe

10 enough to prevent him from working. [AR 90-94.] Plaintiff requested reconsideration of

11 this decision, but his request for benefits was denied once again on April 30, 2014. [AR

12 98-102.] On June 22, 2014, plaintiff requested a hearing before an Administrative Law

13 Judge ("ALJ"). [AR 104-105.] A hearing was held on January 6, 2015. [AR 33, 126-

14 165.]

15        On January 27, 2015, the ALJ concluded that plaintiff was not disabled within the

16 meaning of the SSA and did not qualify for disability insurance benefits. [AR 19-28.]

17 Plaintiff requested review of the ALJ's decision by the Appeals Council. [AR 16.] After

18 considering additional evidence in the form of a representative brief, the Appeals Council

19 denied review of the ALJ's decision on July 13, 2015. [AR 1-5.] If the Appeals counsel

20 denies review, the decision of the ALJ becomes the final decision of the Commissioner.

21 20 C.F.R. § 404.981. The Complaint in this action was then filed on September 3, 2015

22 seeking review of the Commissioner's final decision. [Doc. No. 1.]

23 *II.*   ***Defendant's Motion to Dismiss***.

24        On October 19, 2016, defendant filed a Motion for Involuntary Dismissal for

25 Failure to Prosecute and for Failing to Follow This Court's Amended Scheduling Order.

26 [Doc. No. 25.] In the Motion, defendant cited Federal Rule of Civil Procedure 41(b) and

27 argued that the action should be dismissed without a determination on the merits for

28 failure to prosecute, because plaintiff failed to comply with briefing orders that set a

3

1    schedule for the parties to file cross-motions for summary judgment. [Doc. No. 25-1, at
2    pp. 2-3.]

3        Rule 41(b) authorizes an involuntary dismissal "[i]f the plaintiff fails to prosecute
4    or to comply with [the Federal Rules] or a court order. . . ." Fed.R.Civ.P. 41(b).
5    However, dismissal under Rule 41(b) "is so harsh a penalty it should be imposed as a
6    sanction only in extreme circumstances." *Lal v. California*, 610 F.3d 518, 525 (9th Cir.
7    2010), quoting *Dahl v. City of Huntington Beach*, 84 F.3d 363, 366 (9th Cir.1996).

8        Here, based on a review the docket, it is apparent that plaintiff, who is prosecuting
9    this case *pro se*, did not proceed exactly as directed in the Court's briefing orders and
10   *may* have neglected to serve defense counsel with some of the moving papers he
11   submitted to the Court for filing. Plaintiff's actions resulted in some confusion and a
12   brief delay in getting the case fully briefed for the Court's consideration. [Doc. Nos. 13-
13   36.] These are hardly the type of "extreme circumstances" that would justify an
14   involuntary dismissal under Rule 41(b). It is therefore RECOMMENDED that the
15   District Court DENY defendant's Motion for Involuntary Dismissal and consider
16   plaintiff's Complaint on the merits. [Doc. No. 25.]

17   ### III.   *Standards of Review – Final Decision of the Commissioner.*

18       The final decision of the Commissioner must be affirmed if it is supported by
19   substantial evidence and if the Commissioner has applied the correct legal standards.
20   *Batson v. Comm'r of the Social Security Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004).
21   Under the substantial evidence standard, the Commissioner's findings are upheld if
22   supported by inferences reasonably drawn from the record. *Id.* If there is evidence in the
23   record to support more than one rational interpretation, the District Court must defer to
24   the Commissioner's decision. *Id.* "Substantial evidence means such relevant evidence as
25   a reasonable mind might accept as adequate to support a conclusion." *Osenbrock v.*
26   *Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). "In determining whether the
27   Commissioner's findings are supported by substantial evidence, we must consider the
28   evidence as a whole, weighing both the evidence that supports and the evidence that

1  detracts from the Commissioner's conclusion." *Smolen v. Chater*, 80 F.3d 1273, 1279

2  (9th Cir. 1996).

3       Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary

4  judgment if the movant shows that there is no genuine dispute as to any material fact and

5  the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "Summary

6  judgment motions, as defined by Fed.R.Civ.P. 56, contemplate the use of evidentiary

7  material in the form of affidavits, depositions, answers to interrogatories, and admissions.

8  In Social Security appeals, however, the Court may 'look no further than the pleadings

9  and the transcript of the record before the agency,' and may not admit additional

10  evidence. *Morton v. Califano*, 481 F.Supp. 908, 914 n. 2 (E.D. Tenn.1978); 42 U.S.C.

11  § 405(g). Therefore, although summary judgment motions are customarily used [in

12  social security cases], and even requested by the Court or Magistrate, such motions

13  merely serve as vehicles for briefing the parties' positions, and are not a prerequisite to

14  the Court's reaching a decision on the merits." *Kenney v. Heckler*, 577 F.Supp. 214, 216

15  (N.D. Ohio 1983).

16  **IV.   *Evidence in the Administrative Record.***

17       **A.   *Forms Submitted by Plaintiff to Support His Disability Claim.***

18       A Disability Report prepared at the time plaintiff submitted his application states

19  that his ability to work is limited by the following conditions:  (1) injury to left elbow and

20  right leg/knee; (2) shattered tibia and fibula (two steel plates); (3) transplanted anterior

21  crustate ligament with shattered tibia; (4) shattered radius and ulna (two more steel

22  plates); and (5) "Turrets" possibly due to anesthesia from broken leg surgery. [AR 197-

23  198.] The Disability Report also states that plaintiff has an Associate Degree in

24  architecture that he completed in June 1989. [AR 199.] The examiner who conducted a

25  face-to-face interview with plaintiff on December 9, 2011 noted that plaintiff did not

26  appear to have any difficulty hearing, reading, writing, understanding, speaking,

27  concentrating, sitting, standing, walking, or using his hands. [AR 207.]

28  ///

1    On February 4, 2012, plaintiff submitted a Work History Report stating that he had
2    worked as a clerk in a medical office from 1980 through August 2002 and as a laser
3    technician from September 1989 through May 1993. [AR 209.] As a clerk in a medical
4    office, plaintiff indicated he transcribed doctors' voice recordings of medical files,
5    answered telephones, and retrieved files. [AR 210.] This job also involved sitting for six
6    to seven hours each work day and lifting and carrying expired file boxes weighing 20 to
7    30 pounds about once or twice per month. [AR 210.] Plaintiff's job as a laser technician
8    required him to repair laser printers at six or seven different sites per day. He lifted and
9    carried laser printers weighing about 20 to 75 pounds about three to four times per work
10   day. In this job, plaintiff was required to stand about seven hours per day. [AR 211-
11   212.] Because of "apparent nerve damages" in his left elbow, plaintiff stated in his Work
12   History Report that he can only type for 20 to 30 minutes before it becomes too painful.
13   [AR 220.] On "rare occasions," plaintiff suffers from "Turrets" caused by anesthesia.
14   [AR 220.]

15   In a later Disability Report submitted on June 22, 2012, plaintiff stated that the
16   condition of his knee was getting worse, and it had become too painful to walk, so he had
17   to use his bike as a walker when shopping. [AR 242.] At this time, plaintiff also
18   complained that he was examined at Seagate Medical Group in connection with his
19   disability claim, but the doctor did not review prior relevant medical records and did not
20   ask him about pain or other key symptoms. [AR 247-250.]

21   In another Disability Report, apparently submitted on February 14, 2013, plaintiff
22   reported that the pain in his right knee and shin had increased and he was having
23   difficulty cleaning his home, fixing meals, taking showers, doing laundry, showering, and
24   getting dressed. [AR 267, 270.] He also reported he could no longer walk short
25   distances. [AR 270.]

26   **B.    _Chronological Summary of Medical Records._**

27   The earliest medical treatment records are from August 21, 2002, and were
28   prepared by Rodney D. Henderson, M.D., ten days after plaintiff had surgery to repair a

6

"comminuted, [3] right, tibial plateau fracture."[4] [AR 326.] At this time, plaintiff was reportedly "doing well" and was "weaning off Vicodin." [AR 326.] X-rays showed "good alignment at the fracture site" and "hardware in good position." [AR 326.] In addition, Dr. Henderson reported that there was "no pain with passive motion." [AR 326.]

Thereafter, plaintiff had several follow-up appointments with Dr. Henderson. On September 9, 2002, Dr. Henderson's treatment notes state that: "He is doing well. He denies any pain at rest. He does report some sensation of a bone moving when he moves his legs. . . . There is atrophy of the quadriceps. There is really no swelling at the knee at all, and the incision is completely healed. . . . AP and lateral radiographs of the tibia show no change in the hardware position or alignment. There is still a little varus[5] at the proximal fragment, but this is unchanged from the original x-rays." [AR 325.] Dr. Henderson recommended that plaintiff "continue non-weightbearing and gentle range of motion up to 90 degrees as tolerated. . . ." [AR 325.]

On October 14, 2002, two months after surgery, Dr. Henderson reported that plaintiff was "doing well" and "denie[d] any pain." [AR 324.] At this time, Dr. Henderson indicated plaintiff could begin to "toe-touch weight bear, and do straight leg raises and quad sets." [AR 324.] At the time of his follow-up appointment on November 13, 2002, plaintiff reported he had been "trying to bear weight" but was

---

[3]   "Comminuted" means "a fracture in which the bone is splintered or crushed into numerous pieces." Merriam-Webster Medical Dictionary, http://www.merriam-webster.com/medical/comminuted.

[4]   The "tibia" is "the inner and usually larger of the two bones of the vertebrate hind or lower limb between the knee and ankle." Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/tibia. The "tibial plateau" is "the smooth bony surface of . . . the tibia . . . ." Merriam-Webster Medical Dictionary, http://www.merriam-webster.com/medical/tibial plateau.

[5]   "Varus" means "of, relating to, or being a deformity in which an anatomical part is turned inward toward the midline of the body to an abnormal degree." Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/varus.

1  having some pain in the knee joint. [AR 323.] Dr. Henderson indicated plaintiff could

2  "wean out of the brace," "begin weightbearing," and "use a stationary cycle as tolerated."

3  [AR 323.] Plaintiff continued to progress as indicated in Dr. Henderson's notes dated

4  December 16, 2002 [AR 322]; January 27, 2003 [AR 321]; and March 10, 2003 [AR

5  320].

6  Plaintiff had his final follow-up appointment with Dr. Henderson on June 18, 2003,

7  ten months after his surgery. [AR 319.] The treatment notes state that plaintiff "is doing

8  very well and over the last month his symptoms have markedly improved. He denies any

9  pain. His main problem that he reports, which is very minor, is some weakness when he

10  descends stairs. He has been cycling on a daily basis. [¶]His quadracep development has

11  improved. He has full flexion, full extension, and there is no effusion in the knee.

12  Clinically, there is just very mild varus compared to the opposite knee which is also at

13  slight varus. . . . I will release him from my care. I have recommended that he avoid

14  impact loading exercises. He is certainly safer in continuing cycling and swimming. . . ."

15  [AR 319.]

16  On July 28, 2007, plaintiff went to the emergency room at Scripps Memorial

17  Hospital after he fell off a bicycle and landed on his left side. He had a "significant

18  deformity to his left elbow." [AR 205.] An X-ray revealed "a dislocation of the elbow

19  and radial head, with a fracture of the proximal ulna that is comminuted." [AR 306.] His

20  fracture was "aligned and splinted while he was sedated." [AR 306.] On July 29, 2007, a

21  detailed Operative Report indicates plaintiff had surgery on his left elbow because of a

22  "comminuted unstable Monteggia fracture dislocation." [AR 302-304.] He was

23  discharged on July 31, 2007. [AR 301.] Prior to surgery, plaintiff was advised it was

24  unlikely he would have "return of full range of motion of his elbow and forearm." [AR

25  309.]

26  / / /

27  / / /

28  / / /

8

1   On August 3, 2007, shortly after the surgery on his elbow, plaintiff went to see

2   Dr. Henderson seeking "reassurance" and a "second opinion." [AR 316.] Plaintiff was

3   known to Dr. Henderson, because he previously operated on plaintiff's knee. [AR 316.]

4   At this time, plaintiff's main concern was that he had been told he "may be at risk for

5   dislocation in the future if his elbow comes out into terminal extension." [AR 316.]

6   Dr. Henderson examined plaintiff and was able to review his x-rays. In addition,

7   Dr. Henderson reviewed postoperative radiographs, which showed "essentially anatomic

8   alignment with internal plate fixation with nice concentric joint alignment." [AR 317.]

9   He reassured plaintiff that his x-rays "look excellent." [AR 317.] Dr. Henderson's

10  written report also states as follows: "Theoretically, he is at risk for possibl[e]

11  dislocation and extension secondary to the comminution of the cornoid fragment;

12  however, in my opinion the more likely scenario would be postoperative stiffness

13  limiting full terminal extension which would most likely prevent any episodes of

14  dislocation." [AR 317.]

15  Nine days after his surgery, on August 6, 2007, plaintiff had a follow-up

16  appointment with Dr. Hackley. The treatment notes state that plaintiff was "healing

17  nicely." [AR 330.] Dr. Hackley referred plaintiff to physical therapy to "work on range

18  of motion. . . ." [AR 330.] On August 9, 2007, at the next appointment with

19  Dr. Hackley, plaintiff was "doing well" and his wound was "healing nicely." [AR 329.]

20  Dr. Hackley adjusted the brace on plaintiff's arm "to allow him to range from 45

21  [degrees] to full flexion." [AR 329.] By the next visit on August 20, 2007, plaintiff

22  reported that he had not yet gone to physical therapy. He said he was dealing with some

23  "social issues" and had not had time to see the therapist. [AR 328.] He was still using a

24  brace and the range of motion for his elbow was "30-120 [degrees]." [AR 328.]

25  However, he had a full range of motion in his fingers and wrists. Dr. Hackley

26  encouraged plaintiff to see the physical therapist to work on range of motion exercises.

27  [AR 328.] Six weeks after surgery, on September 10, 2007, Dr. Hackley reported that

28  / / /

1 | plaintiff was still "doing well" and working on his range of motion.  His x-rays showed

2 | "further healing" with "[n]o evidence of subluxation[6] on the static views."  [AR 327.]

3 |      Progress notes dated January 28, 2010 by Denise L. Parnell, M.D., Family Health

4 | Centers of San Diego, indicate that plaintiff had a routine medical examination and

5 | requested to have a form filled out for food stamps.  [AR 379.]  During the examination,

6 | plaintiff reported that he still had pain in his elbow and leg, and his leg swelled if he

7 | walked a mile.  [AR 379.]  He also said he had Tourette syndrome that was "mostly in

8 | remission."  [AR 379.]

9 |      On September 16, 2010, plaintiff had another routine medical examination at

10 | Family Health Centers of San Diego and needed a form filled out for social services.

11 | [AR 378.]  At this time, plaintiff reported that he could walk a mile before his knee

12 | became painful.  There was no swelling in his knee or elbow.  [AR 378.]  His next

13 | appointment at Family Health Centers of San Diego was on October 6, 2010.  At this

14 | time, plaintiff was requesting "disability certification" because of his knee and elbow

15 | injuries.  [AR 377.]  He was not taking any pain medication at this time.  [AR 377.]

16 | Plaintiff was advised that his records would be requested from Scripps to determine

17 | whether he needed "a referral for ortho" and to assess whether he is disabled.  [AR 377.]

18 | In a later follow-up appointment at Family Health Centers of San Diego on June 24,

19 | 2011, plaintiff again requested disability certification for "chronic knee pain" and

20 | reported he could walk a half a mile with difficulty.  However, the attending physician,

21 | Amish Chipwadia, M.D., reviewed plaintiff's "ortho records" and "denied" disability.

22 | [AR 375.]

23 |      On April 2, 2012, plaintiff appeared for a psychiatric consultative examination by

24 | Gregory M. Nicholson, M.D., a Board Certified Psychiatrist.  [AR 337-342.]

25 | Dr. Nicholson's report says plaintiff's "chief complaint" is anxiety.  [AR 337.]  Plaintiff

26 |

27 |

28 | [6]    Subluxation means "partial discloation (as of one of the bones in a joint)." Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/subluxation.

1 | told Dr. Nicholson that he lives alone, and his activities of daily living include cooking
2 | and laundry. He had no difficulty with dressing, bathing, or personal hygiene. Although
3 | he did not drive because he did not have a vehicle, he was able to go out alone. He was
4 | able to handle cash and bills appropriately. [AR 339.] The results of a mental status
5 | examination were normal, but plaintiff's mood and affect were anxious. He appeared to
6 | be of average intelligence, and his memory was intact. His insight, judgment, and "fund
7 | of knowledge w[ere] grossly intact." [AR 340-341.]

8 | Based on his examination of plaintiff, Dr. Nicholson concluded that plaintiff is
9 | able to understand, remember, and carry out simple one or two-step job instructions as
10 | well as detailed and complex instructions. [AR 341.] In addition, Dr. Nicholson
11 | concluded plaintiff has an unlimited ability to accept instructions from a supervisor and
12 | perform work activities without special supervision. [AR 342.] However, his ability to
13 | relate and interact with co-workers and the public and his ability to maintain
14 | concentration, attention, persistence, and pace are "mildly limited." [AR 341.] His
15 | ability to maintain regular attendance was also "mildly limited." [AR 342.]

16 | On April 10, 2012, at the request of the Department of Social Services in
17 | connection with plaintiff's disability claim, plaintiff had x-rays and an orthopedic
18 | consultation, which resulted in written reports by T. Divakaran, M.D., a Radiologist, and
19 | Thomas J. Sabourin, M.D., a Board Certified Orthopedic Surgeon. [AR 344-349.]
20 | Dr. Divakaran's Radiology Report concludes as follows with respect to plaintiff's left
21 | elbow: "Internal fixation plate and screws in the proximal ulna with healed fracture.
22 | Post-traumatic osteoarthritis of the elbow joint." [AR 349.] With respect to plaintiff's
23 | right knee/leg, the Radiology Report concludes as follows: "Internal fixation plate and
24 | screws in the proximal tibia with healed fracture which appears to have extended into the
25 | lateral tibial plateau." [AR 349.]

26 | Dr. Sabourin's report states that plaintiff "took a bike and bus to the evaluation
27 | today." [AR 344.] Plaintiff reported pain in his left elbow and right knee as a result of
28 | "three significant bicycle accidents" which resulted in injuries to his right knee and left

11

1  elbow that both needed surgical repair. [AR 344.] He said his right knee is painful when

2  he walks and his elbow is doing "relatively well," but he "gets some pain" after typing

3  more than 20 minutes. [AR 344.] He was not receiving any medical treatment or using

4  assistance devices for these problems. [AR 344.] Dr. Sabourin completed a physical

5  examination and reported that plaintiff "sits and stands with normal posture;" "sits

6  comfortably during the examination;" "rises from a chair without difficulty;" "has no

7  assistance devices;" and has a normal gait and toe heel walking. [AR 345.] Dr. Sabourin

8  also noted that plaintiff had a normal range of motion in his spine, hips, shoulders, wrists,

9  hands, fingers, ankles, and feet. [AR 346-347.] A neurological examination was also

10  normal except for some decreased sensation near the surgical scar on plaintiff's right leg.

11  [AR 347.] However, Dr. Sabourin's report states that: "There is a 2+ varus instability in

12  the right knee. He has some tenderness over the medial aspect of the right knee. There is

13  no redness, swelling, or gross effusion and there is no significant crepitus. He has a varus

14  deformity in the right knee." [AR 346.] Dr. Sabourin also reviewed the x-rays that were

15  taken on the day of the appointment. [AR 347.]

16       Based on his examination, Dr. Sabourin concluded that plaintiff does have

17  "problems with his right knee and left elbow." [AR 348.] Dr. Sabourin's report also

18  states that: "The left elbow is not too significant [of a] problem. He seems to be getting

19  by with it quite well. The right knee, however, is significant and I feel it does give him

20  significant limitations." [AR 348.] As a result, Dr. Sabourin concluded as follows:

21       I feel he could only lift and carry 20 pounds occasionally and 10
pounds frequently with this knee. He could stand and walk up to two hours
22  in an eight-hour workday and sit for six hours in an eight-hour workday.
Push and pull limitations will be equal to lift and carry limitations. He is
23  unable to walk on uneven terrain with that knee. He could climb, kneel and
crouch only occasionally with that knee. His left elbow is doing well
24  enough that I do not feel he has any significant manipulative limitations, but
he could do gross manipulation such as handling, torqu[e]ing, and grasping
25  with the left elbow only frequently. He does not use any assistive devices.
26  

27  

28  [AR 348.]

1   During an appointment at Family Health Centers of San Diego on February 22,

2   2013, plaintiff complained of chronic pain in his right knee and left elbow, and x-rays

3   were ordered. [AR 364-365.] X-rays were completed on April 3, 2013 and were

4   reviewed by Derrick Allen, M.D., who prepared a detailed report of his findings. As to

5   plaintiff's right knee, Dr. Allen's x-ray findings and conclusion state as follows:

6       1.   Intact orthopedic side plate [within the] lateral tibial plateau.
7             Marked irregularity involving the articular surface of the tibial
              plateau.
8       2.   Moderate size joint effusion.
        3.   Moderate to severe patellofemoral degenerative change.
9

10  [AR 392.]

11  As to plaintiff's elbow, Dr. Allen's findings and conclusions for the x-rays

12  completed on April 3, 2013 state as follows:

13  FINDINGS:

14      Posterior olecranon plate is in place. There is a 2 mm lucency
    between the plate and the posterior aspect of the olecranon. No definite
15  lucency surrounding the screws. Triangular-shaped density projects adjacent
    to the radial head near the capitellum on the oblique view which could
16  potentially be a loose body within the joint space. No definite acute fracture
    line is identified. Well-corticated tiny osseous fragment adjacent to the
17  radial head is also likely sequelae of prior trauma. Irregularity of the radial
    notch of the ulna is likely sequela of old trauma. . . .
18

19
    CONCLUSION:
20  1.   Olecranon orthopedic plate as described above.
    2.   Triangular osseous density between the radial head and capitellum
21        could potentially represent a loose body. This finding is only
22        appreciable on the oblique view. Correlation with any prior
          radiographs would be of benefit. CT scan may also be beneficial.
23  3.   No acute fracture line or evidence of joint effusion.
24

25  [AR 393.]

26  As a result of the x-rays completed on April 3, 2013, Family Health Centers of San

27  Diego referred plaintiff to an orthopedic surgeon for a consultation. [AR 362-363, 359-

28  360.] At his next appointment at Family Health Centers of San Diego on October 15,

1 | 2013, plaintiff indicated he did not know the results of his orthopedic consultation [AR
2 | 357], and the results do not appear to be a part of the Administrative Record. At this
3 | time, plaintiff was taking medication to control high blood pressure, but there is nothing
4 | to indicate he was taking any medication for chronic pain in his knee or elbow. [AR 357-
5 | 358.]

6 | On August 1, 2013, plaintiff had an appointment with Joel J. Smith, M.D., for a
7 | disability evaluation based on his prior right knee and left elbow injuries.[7] [AR 398.] At
8 | this time, plaintiff complained of moderate to severe burning pain in his right knee which
9 | varied from day to day. [AR 398.] Dr. Smith did acknowledge in the assessment section
10 | of his report that plaintiff suffered from joint pain. However, the results of his
11 | examination were within normal ranges. [AR 398-399.] With respect to plaintiff's left
12 | elbow, Dr. Smith noted that there were "no deformities of misalignment of bones," "no
13 | swelling," and no "signs of muscle atrophy." [AR 398.] Dr. Smith also noted as follows:
14 | "The carrying angle of the lower arms is symmetrical. The bony landmarks of the two
15 | elbows are aligned." [AR 399.] "Range of motion testing of the elbow reveals no
16 | restriction or instability related to ligamentous laxity." [AR 399.] "Range of motion in
17 | flexion is approximately 130 degrees." [AR 399.] "Range of motion in extension is
18 | approximately 30 degrees." [AR 399.]

19 | With respect to plaintiff's right knee, Dr. Smith's report states as follows: "The
20 | alignment of the knee and patella are normal; there is no varus or valgus[8] [mis]alignment
21 | of the knee or rotational [mis]alignment of the patella." [AR 399.] "Range of motion
22 | testing of the knee reveals no restriction or instability related to ligamentous laxity." [AR

23 |
24 | ——————————

25 | [7]   The record indicates that Dr. Smith's disability evaluation was added to the record
26 | as "additional evidence" on January 22, 2014, shortly after the December 11, 2013
   | hearing before the ALJ. [AR 277-278.]
27 | [8]   "Valgus" means "of, relating to, or being a deformity in which an anatomical part
28 | is turned outward away from the midline of the body to an abnormal degree." Merriam-
   | Webster Dictionary, http://www.merriam-webster.com/dictionary/valgus.

14

399.] "Strength testing of the major motor muscles of the knee is graded at 5/5." [AR 399.]

### C.   *Administrative Hearing Held on December 11, 2013.*

Plaintiff was represented by counsel at the hearing on December 11, 2013. [AR 29.] At the outset of the hearing, the ALJ stated on the record that plaintiff's "date last insured for disability insurance purpose[s] is September 30, 2007." [AR 29.]

### 1.   *Plaintiff.*

Plaintiff testified that he was fifty-four years old and had attended college. Although he went to college long enough to obtain an Associate Degree, he said he "didn't collect the degree" even though he "did all of the work for it." [AR 30.] Over the past ten to eleven years, plaintiff said he had been living in rental property owned by his parents and received "general relief and food stamps." [AR 31.] He had also recently been approved for health insurance through Medicare or MediCal. [AR 31.]

Plaintiff confirmed that he previously worked as a clerk in a medical office, where he did some typing and filing. He also had to move file boxes when they were ready to be placed in storage. He said he stopped working at this job when he was injured and could not return to this job because he was unable to lift boxes or stay on his feet. He also said he is unable to sit for an eight-hour job because his leg stiffens and he has to get up every few hours. It also takes him a long time to get up and he can then stand for about 10 or 15 minutes. [AR 34-35, 37.] Prior to working as a clerk in a medical office, plaintiff testified that he repaired laser printers and computers. [AR 34.]

Plaintiff testified he was taking medication to control his blood pressure, but when asked if he was taking pain medications, he replied, "I avoid them like the plague." [AR 35.] Plaintiff further testified that he lives alone and is able to do his own grocery shopping. He does not drive but uses buses for transportation. When using the bus system, plaintiff gets on the bus "downhill" from his home and gets off the bus "uphill" from his home, because uphill riding causes pain. On level surfaces, he can ride his bicycle. He also uses the bicycle as a walker when he goes to the grocery store and he

1   puts the groceries in a basket on the handlebars. [AR 36-37.] Because his right leg is

2   "unstable," plaintiff testified that he loses his balance on a daily basis and has trouble

3   with bathing, shower, and getting dressed. [AR 39-40.]

4        According to plaintiff, he must limit his errands. He can do two errands in one

5   day, but if he does two errands on three days in a row, he will be unable to walk for a day

6   or two and must scoot around on the carpet inside his home to get from place to place.

7   [AR 37-38.] When he is not out doing errands, plaintiff testified he usually sits or

8   reclines with his leg elevated and does digital painting on a computer using one hand and

9   no keyboard. [AR 38.]

10       Plaintiff also testified he developed Tourette syndrome when he stopped taking

11  pain medications in 2003. Initially, he had five to seven episodes a day, but they began to

12  taper off in 2010 and it has been a few months since his last episode. [AR 41-42.]

13       In addition, plaintiff testified that his left arm, which previously required surgery,

14  begins to hurt after typing for five or ten minutes. The pain feels like the "nerve kind of

15  damage" he has experienced in his knee and he has to stop after 15 minutes when using

16  his arm for fine motor skills, such as typing. [AR 48.] When he needs to lift something

17  that weighs 10 to 15 pounds, plaintiff said he has to "favor the other arm." [AR 49.] In

18  other words, he is right handed, so his right hand and arm bear the weight and he uses his

19  left hand as a guide. [AR 49.]

20            **2.    _Medical Expert – Anthony E. Francis, M.D._**[9]

21       In preparation for his testimony, Dr. Francis reviewed medical records submitted in

22  support of plaintiff's disability claim through and including April 3, 2013. At this time,

23  Dr. Smith's disability evaluation from August 1, 2013 was not in the record. [AR 42,

24

25  _____

26  [9]    According to his _Curriculum Vitae_, Dr. Francis is experienced in orthopedic

27  surgery and emergency medicine. He also has an extensive educational history in

medicine, as well as a Juris Doctorate and a Legum Doctorate with emphasis in legal

28  medicine. [AR 171.]

277-278.] Based on the record, Dr. Francis testified plaintiff had several musculoskeletal "pathologies or traumas" and a "tic disorder" (*i.e.*, Tourette syndrome). [AR 42.] Based on plaintiff's testimony, Dr. Francis noted that the tic disorder was "getting better." [AR 43.] With respect to plaintiff's musculoskeletal traumas, Dr. Francis testified there was insufficient evidence to conclude plaintiff's condition would meet or equal a listing prior to the date he was last insured (*i.e.*, September 30, 2007) or thereafter. [AR 42-44.] Referring to Listing 1.02A,[10] Dr. Francis reasoned there was some evidence that plaintiff suffered from degenerative arthritis, which can develop after the type of fracture he had in his leg in 2002. In addition, there was evidence to indicate plaintiff had "dysfunction of a major weight-bearing joint" (*i.e.*, his knee). [AR 44.] However, there was insufficient evidence in the record to indicate plaintiff was "unable to ambulate effectively." [AR 44.] With respect to plaintiff's elbow fracture, Dr. Francis testified:

---

[10]     Listing 1.02, Major Dysfunction of a Joint: "Characterized by gross anatomical deformity (*e.g.*, subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of a joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With: A. Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively as defined in 1.00B2b; or B. Involvement of one major peripheral joint in each upper extremity (*i.e.*, shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c." 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.02. "Inability to ambulate effectively means an extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation with the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . ." 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.00B2b(1). "To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. . . ." 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.00B2b(2).

1  "[I]t looks like that was handled well" and "I didn't see a lot of problems after that. So I

2  don't know if that led to any significant impairment." [AR 45.]

3       Based on his review of all of the available records, Dr. Francis testified he was

4  unable to locate evidence indicating plaintiff's residual functional capacity to work was

5  "less than sedentary" prior to his date last insured or at any other time, with the exception

6  of the times he needed to recuperate from fractures. [AR 45-46.] Dr. Francis also

7  commented that results were missing for an orthopedic consultation that was completed

8  sometime after the most recent x-rays of April 3, 2013. [AR 45, referring to AR 357-

9  363.] However, he did not believe these results would make a difference to his analysis.

10  [AR 45.]

11          ***3.   Vocational Expert Bonnie Sinclair, M.S., C.R.C.[11]***

12       On a Work History form, plaintiff indicated he worked as "clerk" in a medical

13  office from 1980 to August 2002. [AR 209.] He described this job as follows:

14  "Transcribe and type Dr.'s voice record of medical files, file & retrieve said files. Some

15  phone work." [AR 210, 47.] He also indicated he was required to lift and carry "boxes

16  of expired files for disposal weighing approx. 20 to 30 lbs, about twice a month or so."

17  [AR 210, 47.]

18       Ms. Sinclair testified that plaintiff's past relevant work as a stenographer/

19  transcriber is generally considered "skilled sedentary work" and requires a person to sit

20  six to seven hours per day to write, type, or handle small objects. [AR 46-47.] However,

21  the particular job that plaintiff previously held fits in the category of light work, because

22  he was required to lift file boxes weighing 20 to 30 pounds about twice per month. On

23

24

25

---

26  [11]   According to her Curriculum Vitae, Ms. Sinclair has a Master of Science Degree in

27  Vocational Rehabilitation Counseling. She has many years of experience in this field and

28  also has a number of other credentials in the area of vocational rehabilitation and
counseling. [AR 167-169.]

1  the other hand, it was Ms. Sinclair's view that this type of job would no longer require

2  lifting of file boxes because of advancements in electronics. [AR 46-47.]

3       Plaintiff's counsel asked Ms. Sinclair if an individual who was only able to

4  perform fine motor movements 50 percent of the day would be able to perform the job of

5  transcriber. Ms. Sinclair responded that the job of transcriber requires reaching,

6  handling, and fingering frequently (*i.e.*, between 33 and 66 percent of the work day).

7  Therefore, it "would be cutting it a little close" for a person to do this job if he could only

8  perform fine motor skills for 50 percent of the day. [AR 50.] Such a person would be

9  able to do the job if it did not require "constant" transcribing. [AR 50.] However,

10  Ms. Sinclair further testified that that such an individual would be unable to sustain the

11  job of transcriber if he missed four or more days of work per month because of pain

12  limitations. [AR 50-51.]

13  *V.*   ***Insured Status Requirements.***

14       Plaintiff claimed he was disabled beginning on August 10, 2002 and did not file his

15  application for disability benefits until December 9, 2011. The ALJ therefore considered

16  whether plaintiff met the insured status requirements under the Social Security Act and

17  made the following finding: "The claimant's earnings record shows that the claimant has

18  acquired sufficient quarters of coverage to remain insured through September 30, 2007.

19  Thus, the claimant must establish disability on or before that date in order to be entitled

20  to a period of disability and disability insurance benefits."[12] [AR 13.] Plaintiff does not

21  challenge this finding.

22

23  —————————————

24  [12]   *See, e.g., Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995) (stating that the

25  claimant "must prove that [he or] she was either permanently disabled or subject to a
     condition which became so severe as to disable her prior to the date upon which her

26  disability insured status expires.")

27

28

1  ## VI.  *The ALJ's Five-Step Disability Analysis.*

2      To qualify for disability benefits under the SSA, an applicant must show that he or

3  she is unable to engage in any substantial gainful activity because of a medically

4  determinable physical or mental impairment that has lasted or can be expected to last at

5  least 12 months.  42 U.S.C. § 423(d).  The Social Security regulations establish a five-

6  step sequential evaluation for determining whether an applicant is disabled under this

7  standard.  20 C.F.R. § 404.1520(a); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

8      At step one, the ALJ must determine whether the applicant is engaged in

9  substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(I).  In this case, the ALJ

10  concluded that plaintiff had not engaged in substantial gain activity since August 10,

11  2002, the date he alleged his disability began.  [AR 15.]

12      At step two, the ALJ must determine whether the applicant is suffering from a

13  "severe" impairment within the meaning of Social Security regulations from the date he

14  was last insured.  20 C.F.R. § 404.1520(a)(4)(ii).  "An impairment or combination of

15  impairments is not severe if it does not significantly limit [the applicant's] physical or

16  mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  For example, a

17  slight abnormality or combination of slight abnormalities that only have a minimal effect

18  on the applicant's ability to perform basic work activities will not be considered a

19  "severe" impairment.  *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).  Examples of

20  basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching,

21  carrying, handling, seeing, hearing, speaking, understanding, carrying out and

22  remembering simple instructions, use of judgment, responding appropriately to

23  supervision, co-workers and usual work situations, and dealing with changes in a routine

24  work setting.  20 C.F.R. § 404.1521(b)(1)-(6).  "If the ALJ finds that the claimant lacks a

25  medically severe impairment, the ALJ must find the claimant not to be disabled."  *Webb*

26  *v. Barnhart*, 433 F.3d at 686.

27      Here, the ALJ found at step two that plaintiff had severe impairments, including a

28  "Tic disorder/Tourette's Syndrome;" "status post" reconstruction of his right knee;

1   "status post" fracture of his left elbow; "residual medial instability of the right knee;" and

2   "moderate degenerative joint disease of the right knee." [AR 15-16.]  Although the ALJ

3   acknowledged there was evidence in the record indicating plaintiff suffered from anxiety,

4   the ALJ concluded it was "non-severe," because it did not "cause more than minimal

5   limitation in [his] ability to perform basic mental work activities." [AR 16.]

6        If there is a severe impairment, the ALJ must then determine at step three whether

7   it meets or equals one of the listings of impairments in the Social Security regulations.

8   20 C.F.R. § 404.1520(a)(4)(iii).  If the applicant's impairment meets or equals a listing,

9   he or she must be found disabled.  *Id.*

10       In this case, the ALJ concluded at step three that plaintiff does not have an

11   impairment or combination of impairments that meets or medically equals the severity of

12   one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  [AR 17.]

13   The ALJ reasoned that the testifying medical expert and state agency physicians opined

14   that plaintiff's medical condition does not meet or equal a listing and no treating or

15   examining physician made findings that would satisfy the severity requirements in the

16   Listing of Impairments.  [AR 17.]

17       If an impairment does not meet or equal a listing, the ALJ must make a step four

18   determination of the claimant's residual functional capacity based on all impairments,

19   including impairments that are not severe.  20 C.F.R. § 404.1520(e), § 404.1545(a)(2).

20   "Residual functional capacity" is "the most [an applicant] can still do despite [his or her]

21   limitations."  20 C.F.R. § 404.1545(a)(1).  The ALJ must determine whether the applicant

22   retains the residual functional capacity to perform his or her past relevant work.

23   20 C.F.R. § 404.1520(a)(4)(iv).  The ALJ's determination is made "based on all the

24   relevant medical and other evidence in [the claimant's] case record."  20 C.F.R.

25   § 404.1520(e).  A claimant is not disabled if he or she can still do his or her past relevant

26   work.  20 C.F.R. § 404.1520(a)(4)(iv).

27       Here, the ALJ concluded plaintiff does not qualify for disability benefits, because

28   he has the residual functional capacity to perform a full range of sedentary work.  [AR

21

17-22.] According to the ALJ, plaintiff is able to perform his past relevant work as a stenographer/transcriber, which is considered skilled sedentary work as it is performed in the national economy, because he can lift and carry ten pounds, and sit, walk, or stand for six hours in an eight-hour workday. [AR 21-22.] In reaching this conclusion, the ALJ discredited plaintiff's testimony indicating he could not perform sedentary work because of disabling pain in his left arm and right leg. [AR 20-22.][13]

## VII.   *Discussion.*

### A.   *The Parties' Cross-Motions for Summary Judgment.*

In his Motion for Summary Judgment, plaintiff attempts to enlarge and embellish the testimony he gave at the hearing before the ALJ to convince the Court that the ALJ's denial of his disability claim is erroneous, because he has long suffered from disabling pain caused by injuries and severe deformities in his knee and elbow [Doc. No. 32, at pp. 1-25] and from a disabling mental illness (Tourette syndrome) that renders him unable "to function or discern reality." [Doc. No. 32, at p. 28.] However, the Court is unable to consider additional testimony or evidence that was not presented at the hearing before the ALJ. "In the context of judicial review of a decision of the Commissioner regarding SSI disability benefits, evidence outside the administrative record generally is precluded from consideration by the court." *Baker v. Barnhart*, 457 F.3d 882, 891 (8th Cir. 2006).

Plaintiff's Motion for Summary Judgment also attacks the written medical opinions in the record for various reasons, such as the doctors' alleged failure to ask him any questions about pain. [Doc. No. 32, at p. 4-5.] However, in *Meanel v. Apfel*, 172 F.3d 1111 (9th Cir.1999), the Ninth Circuit explained that "appellants must raise issues at their administrative hearings in order to preserve them on appeal." *Id.* at 1115. Plaintiff

---

[13]   Since the ALJ concluded plaintiff was not disabled at step four, he did not reach step five of the disability analysis, which requires a determination as to whether the applicant can perform any other work in the national economy. 20 C.F.R. § 404.1520(a)(4)(g),(v); 20 C.F.R. § 404.1545(e); 20 C.F.R. § 416.929.

1   was represented by counsel at the hearing before the ALJ. Through his counsel, plaintiff

2   did not object to the state of the record or to any of the challenged physician reports. As

3   a result, plaintiff waived any argument that the reports by these physicians are deficient

4   in any significant manner. It is therefore RECOMMENDED that the District Court

5   DENY plaintiff's Motion for Summary Judgment, because he has not shown that the

6   ALJ's decision to deny benefits is not supported by substantial evidence or that the ALJ

7   failed to apply the correct legal standards.

8        Defendant argues that the ALJ's decision to deny plaintiff's disability claim should

9   be affirmed, because substantial evidence supports the ALJ's determination that plaintiff

10  was not disabled on or before September 30, 2007, his date last insured. Defendant also

11  argues that the ALJ's decision should be affirmed, because it is free from legal error.

12  [Doc. No. 26-1.]

13        As noted above, the final decision of the Commissioner must be affirmed if it is

14  supported by substantial evidence and if the Commissioner has applied the correct legal

15  standards. *Batson v. Comm'r of the Social Security Admin.*, 359 F.3d at 1193. Based on

16  a careful review of the record, it is this Court's view that the ALJ's decision is supported

17  by substantial evidence. First, the ALJ's decision that plaintiff has the residual functional

18  capacity for sedentary work is supported by the treatment records and the opinions of

19  several medical professionals, including treating and examining physicians, and the

20  testifying medical expert, all of which are summarized above. There is no objective

21  medical evidence in the record to support a conclusion that plaintiff qualifies for

22  disability benefits, because he suffered a disability under the SSA on or before

23  September 30, 2007, his date last insured.

24        Second, the ALJ appropriately rejected plaintiff's testimony that he is unable to

25  work at a sedentary job because he suffers from disabling pain. In *Light v. Social*

26  *Security Administration*, 119 F.3d 789 (9th Cir. 1997), the Ninth Circuit held that an ALJ

27  cannot discredit or reject subjective claims of "excess pain" based solely on a lack of

28  objective medical support in the record. *Id.* at 792-793. "In assessing the credibility of a

16cv215-GPC(KSC)

1   claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ

2   engages in a two-step analysis. [Citation omitted.]  First, the ALJ must determine whether

3   there is 'objective medical evidence of an underlying impairment which could reasonably

4   be expected to produce the pain or other symptoms alleged.' [Citations omitted.]  If the

5   claimant has presented such evidence, and there is no evidence of malingering, then the

6   ALJ must give 'specific, clear and convincing reasons' in order to reject the claimant's

7   testimony about the severity of the symptoms. [Citations omitted.]  At the same time, the

8   ALJ is not 'required to believe every allegation of disabling pain, or else disability

9   benefits would be available for the asking, a result plainly contrary to 42 U.S.C. §

10  423(d)(5)(A).' [Citation omitted.]  In evaluating the claimant's testimony, the ALJ may

11  use 'ordinary techniques of credibility evaluation.' [Citation omitted.]   For instance, the

12  ALJ may consider inconsistencies either in the claimant's testimony or between the

13  testimony and the claimant's conduct, [such as] . . . 'whether the claimant engages in

14  daily activities inconsistent with the alleged symptoms.' [Citation omitted.] While a

15  claimant need not 'vegetate in a dark room' in order to be eligible for benefits, [citation

16  omitted], the ALJ may discredit a claimant's testimony when the claimant reports

17  participation in everyday activities indicating capacities that are transferable to a work

18  setting. [Citation omitted.]  Even where those activities suggest some difficulty

19  functioning, they may be grounds for discrediting the claimant's testimony to the extent

20  that they contradict claims of a totally debilitating impairment. [Citation omitted.]"

21  *Molina v. Astrue*, 674 F.3d 1104, 1112-1113 (9th Cir. 2012

22          Under Social Security regulations, factors to be considered in evaluating the

23  intensity, persistence, and limiting effects of a claimant's symptoms include:  (i) daily

24  activities; (ii) the location, duration, frequency, and intensity of pain or other symptoms;

25  (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side

26  effects of any medication taken to alleviate pain or other symptoms; (v) treatment to

27  relieve pain or symptoms other than medication; (vi) any measures used to relieve pain or

28  other symptoms (*e.g.*, lying flat, standing for 15 to 20 minutes every hour, sleeping on a

1 | board, etc.); and (vii) functional limitations and restrictions due to pain or other
2 | symptoms.  20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3); Social Security
3 | Regulation 16-3p.

4 | "A finding that a claimant's testimony is not credible 'must be sufficiently specific
5 | to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony
6 | on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding
7 | pain.' [Citation omitted.]  General findings are insufficient; rather, the ALJ must identify
8 | what testimony is not credible and what evidence undermines the claimant's complaints.
9 | [Citation omitted.]" *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015).  The
10 | Court is "constrained to review the reasons the ALJ asserts." *Brown-Hunter*, 806 F.3d at
11 | 492.  On the other hand, "there is no rigid requirement that the ALJ specifically refer to
12 | every piece of evidence in his decision." *Reid v. Comm'r of Social Sec.*, 769 F.3d 861,
13 | 865 (4th Cir. 2014), quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005).

14 | Here, the ALJ acknowledged the existence of objective evidence indicating
15 | plaintiff has impairments that could reasonably be expected to produce the alleged
16 | symptoms.  However, based on the evidence submitted, the ALJ concluded that
17 | plaintiff's "statements concerning the intensity, persistence, and limiting effects of these
18 | symptoms are not entirely credible for the reasons explained in this decision." [AR 25.]
19 | The ALJ stated several reasons for this conclusion, each of which is discussed separately
20 | below.

21 | ### 1. *Lack of Objective Medical Evidence.*

22 | The ALJ's first reason for rejecting plaintiff's testimony is that the objective
23 | medical evidence does not show that plaintiff's symptoms are frequent or severe enough
24 | to significantly interfere with his ability to work. [AR 20.]  In support of this reason, the
25 | ALJ cited substantial objective evidence in the record.  For example, the ALJ noted that
26 | neurological examinations "have revealed no significant focal deficits." [AR 20.]
27 | Plaintiff's medical records show he can walk in a satisfactory manner and there is nothing
28 | to indicate he suffers from muscle weakness, loss of muscle control, muscle atrophy, or

wasting in the arms and legs due to nerve damage. [AR 20.] Treating source opinions indicate plaintiff "experienced excellent results postoperatively." [AR 21.] Other physicians who examined plaintiff and/or reviewed his medical records have concluded he remains capable of performing full time work on a sustained basis. [AR 21.] The ALJ gave these opinions significant weight, because they contain detailed clinical findings and narratives explaining and supporting the medical opinions. [AR 21.] However, as noted above, an ALJ cannot "reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain." *Burch v. Barnhart* (9th Cir. 2005) 400 F.3d 676, 680 (9th Cir. 2005). As a result, the ALJ's first reason, standing alone, is not enough to discredit plaintiff's testimony that he is totally disabled by pain and inability to ambulate effectively.

## 2. *Conservative Course of Treatment.*

The ALJ's next reason for rejecting plaintiff's testimony is that the record indicates he had only conservative care for his elbow and knee following surgery and recovery. More specifically, the record indicates plaintiff did take medications postoperatively, and they were effective in controlling his pain. Following recovery, the record indicates plaintiff's was not taking medication to control pain in his arm or leg. [AR 20.] The Court notes also that when asked during the hearing whether he was taking pain medications, plaintiff replied, "I avoid them like the plague." [AR 35.]

"Impairments that can be controlled effectively with medication are not disabling." *Warre v. Commissioner of Social Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006). Evidence of "conservative treatment" can be sufficient to discredit a claimant's testimony about the severity of an impairment. *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995). For example, "over-the-counter pain medication" is considered "conservative treatment" that is sufficient to discount a claimant's testimony. *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007). An ALJ may also infer that a claimant's "response to conservative treatment undermines [his] reports regarding the disabling nature of his pain." *Tommasetti v. Astrue*, 533 F.3d 1034, 1039-1040 (9th Cir. 2008).

16cv215-GPC(KSC)

1   As noted above, the ALJ may use "ordinary techniques of credibility evaluation."

2   *Molina v. Astrue*, 674 F.3d at 1112-1113.  The ALJ is also entitled to draw inferences

3   "logically flowing from the evidence."  *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996).

4   On the record before the Court, the ALJ could reasonably discount plaintiff's claims of

5   disabling pain, because the record indicates he was not taking any medications to treat his

6   alleged disabling pain after he recovered from the surgeries on his left elbow and right

7   knee.  [AR 344, 357-358, 377.]  Thus, it is this Court's view that the ALJ has stated a

8   clear and convincing reason for discrediting plaintiff's testimony that he is totally

9   disabled by pain.

10   ### 3.   *Physical Limitations and Special Accommodations.*

11   The ALJ's third reason for rejecting plaintiff's testimony is that the record does not

12   show plaintiff suffered from any physical limitations indicative of a total disability or that

13   he required any special accommodations (*e.g.*, special breaks or positions) to relieve his

14   pain.  For example, the ALJ noted plaintiff did not exhibit any significant atrophy, loss of

15   strength, or difficulty moving that are indicative of severe and disabling pain.  Although

16   he alleged loss of balance, he had a normal gait and did not require any assistive devices

17   to ambulate.  [AR 26-27.]

18   The ALJ's conclusions in this regard are supported by substantial evidence in the

19   record.  First, Dr. Sabourin, who completed an orthopedic examination of plaintiff on

20   April 10, 2012, stated in his written report that plaintiff has a normal gait, normal posture,

21   and normal "[t]oe heel walking."  [AR 345.]  He also reported that plaintiff did not have

22   any assistance devices, has a relatively normal range of motion, and could rise from a

23   chair without difficulty.  [AR 345-346.]  Dr. Sabourin did acknowledge that plaintiff has

24   some problems with his right knee and left elbow, but concluded he did not have "any

25   significant manipulative limitations" in his left elbow and could "walk up to two hours in

26   an eight-hour workday" and "lift and carry 20 pounds occasionally and 10 pounds

27   frequently with this knee."  [AR 348.]  Similar results were expressed by Dr. Smith, who

28   examined plaintiff on August 1, 2013.  Dr. Smith's report states that plaintiff did not have

1 | any swelling or signs of muscle atrophy and had normal strength and range of motion.

2 | [AR 398-399.] It is true that plaintiff testified he uses his bicycle as a walker when he

3 | does his grocery shopping [AR 36-37], but there is no evidence in the record to indicate

4 | he needed or used any medically prescribed assistive devices to ambulate. Thus, it is this

5 | Court's view that the ALJ has stated a clear and convincing reason for discrediting

6 | plaintiff's testimony that he is totally disabled by pain.

7 |            **4.**    _**Routine Daily Activities.**_

8 |       The ALJ's decision further states as follows: "Additionally, there is no indication

9 | in the evidence of record that the claimant is unable to attend to routine daily activities.

10 | Moreover, the claimant's routine activities establish a level of functioning greater than

11 | that alleged. The claimant's activities of daily living include the ability to cook his own

12 | meals and do laundry. He is able to go out alone and he can handle bills and handle cash

13 | appropriately without assistance." [AR 21.] This evidence about plaintiff's daily

14 | activities is from a report prepared by Dr. Nicholson, the Board Certified Psychiatrist

15 | who examined plaintiff on April 2, 2012. [AR 337-342.]

16 |       In addition to the daily activity information in Dr. Nicholson's report, plaintiff

17 | testified at the hearing that he is able to use buses for transportation to do errands, can

18 | ride his bicycle on level surfaces, and do his grocery shopping while using his bicycle as

19 | a walker and the basket on his bicycle as grocery carrier. [AR 36-37.]

20 |       "While a claimant need not 'vegetate in a dark room' in order to be eligible for

21 | benefits, the ALJ may discredit a claimant's testimony when the claimant reports

22 | participation in everyday activities indicating capacities that are transferable to a work

23 | setting. Even where those activities suggest some difficulty functioning, they may be

24 | grounds for discrediting the claimant's testimony to the extent that they contradict claims

25 | of a totally debilitating impairment. _Molina v. Astrue_, 674 F.3d 1104, 1112-13 (9th Cir.

26 | 2012).

27 |       A claimant's "daily activities" is one of the factors that may be considered by an

28 | ALJ in evaluating the credibility of a claimant's testimony about the extent of his or her

1  pain or impairment. *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007). However, the ALJ

2  may not discredit a claimant's testimony about the extent of his or her pain and

3  impairment based solely on "daily activities, such as grocery shopping, driving a car, or

4  limited walking for exercise." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001).

5  An ALJ may reject a claimant's testimony about the extent of his or her pain or

6  impairment if "'a claimant is able to spend a substantial part of [the] day engaged in

7  pursuits involving the performance of physical functions that are transferable to a work

8  setting.'" *Orn*, 495 F.3d at 639 (internal citation omitted).

9      Although plaintiff did testify that his daily activities are significantly limited by

10  pain in his arm and knee, the ALJ had reason to question this testimony based on

11  Dr. Nicholson's report and the other credibility factors discussed above. It is true that the

12  evidence about plaintiff's daily activities, standing alone, is not enough to discredit his

13  testimony that he is disabled by pain. However, this evidences does lend some support to

14  the ALJ's decision to reject plaintiff's testimony that he suffers from disabling pain.

15      Based on the foregoing, it is this Court's view that the ALJ's decision denying

16  plaintiff's claim for disability benefits is supported by specific, clear, and convincing

17  reasons for rejecting plaintiff's testimony about the severity of his pain. In addition, it is

18  also this Court's view that the ALJ's decision to deny disability benefits is supported by

19  substantial evidence and free from legal error.

20      **B.    *Plaintiff's Motion to Exclude Evidence [Doc. No. 30].***

21      In his Motion to Exclude Evidence [Doc. No. 30], plaintiff argues that the Court

22  should exclude the "expert testimony" of the following non-treating, examining

23  physicians for "failure to meet the *Daubert* standard": [Doc. No. 30, at p. 1.]

24  (1) Dr. Nicholson, M.D.; (2) Dr. Sabourin, M.D.; and (3) Dr. Smith, M.D. [Doc. No. 30,

25  at p. 1.] As outlined more fully above, Dr. Nicholson is a Board Certified Psychiatrist,

26  who completed a consultative examination of plaintiff on April 2, 2012 and prepared a

27  written report. [AR 337-342.] Dr. Sabourin is a Board Certified Orthopedic Surgeon

28  who examined plaintiff on April 10, 2012 and prepared a written report. [AR 344-349.]

1    Dr. Smith, M.D., examined plaintiff on August 1, 2013 and prepared a disability report.

2    [AR 398-399.] None of these physicians testified at plaintiff's hearing.

3         Essentially, plaintiff argues that the Court should not consider the reports prepared

4    by these physicians, because they failed to adequately address key issues that are relevant

5    to plaintiff's disability claim, and, as a result, they failed "to meet the *Daubert* standard."

6    [Doc. No. 30, at p. 1.] According to plaintiff, Dr. Nicholson's report should be excluded,

7    because he failed to address plaintiff's allegation that he suffers from a mental health

8    condition known as Tourette syndrome. [Doc. No. 30, at p. 1.] With respect to

9    Dr. Sabourin's report, plaintiff argues that it should be excluded because he avoided and

10   failed to discuss "the central issue of pain." [Doc. No. 30, at pp. 1-2.] Finally, plaintiff

11   points to a blank form in the record [AR 396] and argues that Dr. Smith's report should

12   be excluded, because he reported reviewing x-rays but did not fill out the form to obtain

13   any x-rays. Plaintiff believes this is evidence of "false testimony." [Doc. No. 30, at pp.

14   6-7.] However, plaintiff's argument is nonsensical. A review of the record does not

15   support plaintiff's interpretation of the cited documents, and Dr. Smith's report indicates

16   that his disability evaluation is based on a physical examination of plaintiff without

17   reference to x-rays. [AR 394-399.]

18        It is this Court's view that plaintiff's Motion to Exclude Evidence should be

19   rejected for at least four reasons. First, plaintiff's reliance on *Daubert v. Merrell Dow*

20   *Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) is misplaced. "The Federal Rules of

21   Evidence do not apply to the admission of evidence in Social Security administrative

22   proceedings. *See* 42 U.S.C. § 405(b)(1); 20 C.F.R. §§ 404.950(c), 416.1450(c) ('The

23   administrative law judge may receive evidence at the hearing even though the evidence

24   would not be admissible in court under the rules of evidence used by the court.');

25   *Richardson v. Perales*, 402 U.S. 389, 400, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)

26   ('[S]trict rules of evidence, applicable in the courtroom, are not to operate at social

27   security hearings so as to bar the admission of evidence otherwise pertinent....')." *Bayliss*

28   *v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005).

1    Second, in *Meanel v. Apfel*, 172 F.3d 1111 (9th Cir.1999), the Ninth Circuit

2  explained that "appellants must raise issues at their administrative hearings in order to

3  preserve them on appeal." *Id.* at 1115.  Plaintiff was represented by counsel at the

4  hearing before the ALJ.  Through his counsel, plaintiff did not object to the state of the

5  record or to any of the challenged physician reports.  As a result, plaintiff waived any

6  argument that the reports by these physicians are deficient in any significant manner.

7    Third, as noted above, plaintiff had the burden of proving eligibility at steps one

8  through four of the five-step disability analysis.  *Celaya v. Halter*, 332 F.3d at 1180.  To

9  the extent he disagreed with the opinions of any of the physicians who examined him in

10  connection with his disability claim, plaintiff could have presented contrary evidence by

11  a treating or other physician but failed to do so.

12    Finally, even if plaintiff objected to consideration of the challenged reports during

13  the administrative hearing before the ALJ on the grounds stated in his Motion to Exclude

14  Evidence, there is nothing to indicate the ALJ would have sustained any such objection.

15  The challenged reports include relevant, objective medical evidence by three physicians

16  who examined plaintiff and then prepared written reports with clear, detailed

17  explanations for the medical opinions they expressed.  As a result, the ALJ was entitled

18  to consider these reports even though they do not say what plaintiff would have liked

19  them to say.

20    For the foregoing reasons, there is no basis for granting plaintiff's request to

21  exclude reports by Dr. Nicholson, Dr. Sabourin, and Dr. Smith for "failure to meet the

22  *Daubert* standard" [Doc. No. 30, at p. 1] or for any other reason.  It is therefore

23  RECOMMENDED that the District Court DENY plaintiff's Motion to Exclude

24  Evidence.  [Doc. No. 30.]

25  ///

26  ///

27  ///

28  ///

C.   ***Plaintiff's Ex Parte Request to Supplement the Administrative Record [Doc. No. 28].***

On November 3, 2016, plaintiff submitted a letter addressed to the Court, which has been construed as a renewed Ex Parte Request to Supplement the Administrative Record.[14] [Doc. No. 28.] In this Ex Parte Request, plaintiff argues that x-ray images material to the ALJ's disability determination were erroneously omitted from the record. According to plaintiff, he only became aware that these x-ray images were omitted when he received a copy of the record for use in this proceeding. The allegedly omitted x-ray images date back as far as his initial injury on August 10, 2002. Plaintiff believes these x-ray images were erroneously omitted from the record even though he took all necessary steps to release all of his medical records for submission in support of his disability claim. [Doc. No. 28, at pp. 1-3.] Plaintiff argues that these x-ray images should have been included in the record all along for review by the ALJ and by this Court, because they show the severity of his injuries. He speculates that a lay person with "an elementary school protractor" would be able to measure "the degree of painful bending in the bones." [Doc. No. 28, at p. 3-4.] In addition, plaintiff contends these x-rays can be compared to show "the progressive and chronic nature" of his injuries. [Doc. No. 28, at p. 4.]

As plaintiff acknowledges, however, the record does include x-ray reports and/or written observations by several physicians who reviewed actual x-ray images. [Doc. No.

---

[14]   Plaintiff essentially raised the same issue in a prior letter to the Court that was filed on June 17, 2016. [Doc. No. 19.] The Court construed plaintiff's letter as a Motion to Continue to Present New Evidence. [Doc. No. 23.] The letter requested to continue the case so that plaintiff could obtain x-rays "since 2002" because he believed this evidence would show "an inaccurate diagnosis" that affected the outcome of his disability claim. [Doc. No. 23, at p. 1, citing Doc. No. 17, at p. 1.] Plaintiff's letter request was denied without prejudice, because he did not show that this "new evidence" is material or that there was "good cause" for failure to include this evidence in the administrative proceeding. [Doc. No. 23, at pp. 3-4.]

16cv215-GPC(KSC)

28, at p. 5, referring to the omitted x-rays and stating that "[o]nly written observance is mysteriously included."]  For example, the earliest reference to an x-ray in the record was made in treatment notes by Dr. Henderson from August 21, 2002, "ten days" after plaintiff's knee surgery. [AR 320.]  Dr. Henderson's treatment notes include a section entitled "X-Rays," which states as follows:  "AP and lateral radiographs show good alignment at the fracture site [and] hardware in good position." [AR 326.]  As summarized more fully above, the record also includes several other detailed x-ray reports. [*See, e.g.*, AR 392-393.]  Dr. Henderson's treatment notes from plaintiff's final follow up appointment on June 18, 2003 do not refer to x-ray images but state that plaintiff "has full flexion, full extension, and there is no effusion in the knee.  Clinically, there is just very mild varus compared to the opposite knee which is also at slight varus." [AR 319.]  However, when Dr. Sabourin later reviewed x-rays taken on April 10, 2012, he concluded that plaintiff had "a significant varus deformity" in his right knee. [AR 347-348.]  As a result, he concluded plaintiff had "problems with his right knee" that required "significant limitations." [AR 348.]  Among other limitations, Dr. Sabourin concluded plaintiff could only lift and carry 20 pounds occasionally and 10 pounds frequently because of the condition of his knee. [AR 348.]

"In the context of judicial review of a decision of the Commissioner regarding SSI disability benefits, evidence outside the administrative record generally is precluded from consideration by the court." *Baker v. Barnhart*, 457 F.3d 882, 891 (8th Cir. 2006).  In this regard, Title 42, United States Code, Section 405(g), states in pertinent part as follows: "The court shall have power to enter, **upon the pleadings and transcript of the record,** judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for rehearing." 42 U.S.C. § 405(g) (emphasis added).

When new evidence that is not part of the administrative record is presented for the first time to the District Court, Section 405(g) allows the District Court to remand the case to the Social Security Administration for consideration if, and only if there is "a

16cv215-GPC(KSC)

1   showing" that the new evidence is "material" and that there is "good cause for the failure

2   to incorporate such evidence into the record in a prior proceeding. . . ." 42 U.S.C.

3   § 405(g); *Brewes v. Commissioner of Social Sec. Admin.*, 682 F.3d 1157, 1164 (9th Cir.

4   2012).

5       "Good cause" exists if the claimant can provide a reasonable explanation as to why

6   new evidence was unavailable earlier. *Mayes v. Massanari*, 276 F.3d 453, 463 (9th Cir.

7   2001). For example, "[n]ew medical evidence that becomes available due to

8   improvements in technology meets the good cause standard, and shall be considered if it

9   also meets the materiality requirement." *Wainwright v. Sec'y of Health & Human Servs.*,

10   939 F.2d 680, 683 (9th Cir. 1991). "A claimant does not meet the good cause

11   requirement by merely obtaining a more favorable report once his or her claim has been

12   denied." *Mayes v. Massanari*, 276 F.3d at 463. Without more, a simple assertion "that

13   the evidence only turned up later" is also not enough to satisfy the "good cause" standard.

14   *Clem v. Sullivan*, 894 F.2d 328, 332 (9th Cir. 1990).

15       New evidence is "material" if there is a reasonable possibility that it would have

16   changed the outcome of the claim for disability benefits. *Booz v. Sec'y of Health and*

17   *Human Servs.*, 734 F.2d 1378, 1380-1381 (9th Cir. 1984). The new evidence must be

18   probative of the claimant's condition as it existed during the relevant time period and

19   prior to the disability hearing. *Sanchez v. Sec'y of Health and Human Servs.*, 812 F.2d

20   509, 511-512 (9th Cir. 1987). New evidence of "later-acquired disabilities or subsequent

21   deterioration of a previously non-disabling condition" are not "material." *Jones v.*

22   *Callahan*, 122 F.3d 1148, 1154 (8th Cir. 1997). In *Sanchez v. Secretary of Health and*

23   *Human Services*, 812 F.2d 509, for example, the Ninth Circuit concluded that the

24   claimant's new evidence was not material because "at most, [it showed] deterioration

25   after the hearing, which would be material to a new application but not probative of [the

26   claimant's] condition at the hearing." *Id.* at 512.

27       Based on the arguments in his Ex Parte Request, plaintiff's position is that there is

28   "good cause" to supplement the record with x-ray images because they were part of the

1    medical records he released to support his disability claim and should have been included

2    in the record all along.  However, if the x-ray images should have been included all

3    along, plaintiff does not explain why his counsel failed to object to the state of the record

4    during the administrative proceedings, particularly when plaintiff had the burden at that

5    time to prove he was disabled.  Plaintiff has therefore not shown good cause for failing to

6    include the x-ray images in the record during the administrative proceeding and has

7    waived any argument that the record is deficient because the x-ray reports conflict with

8    the actual x-ray images.

9         Plaintiff's Ex Parte Request also takes the position that the x-ray images are

10   material to the disability analysis, because the x-ray reports do not accurately portray the

11   extent of post-surgical deformity in his right knee and left elbow which has resulted in

12   disabling pain.  Despite plaintiff's speculative argument that a lay person with "an

13   elementary school protractor" would be able to look at the x-ray images and measure "the

14   degree of painful bending in the bones," the x-ray images are not material to the ALJ's

15   disability analysis.

16        An ALJ is generally "not qualified to interpret raw medical data in functional

17   terms" and must rely on the opinions of qualified medical professionals.  *Nguyen v.*

18   *Chater*, 172 F.3d 31, 35 (1st Cir. 1999).  *See also Rivera-Torres. v. Sec. of Health and*

19   *Human Svcs.*, 837 F.2d 4, 6-7 (1st Cir. 1988) (concluding that "the ALJ, a lay factfinder,

20   lacks sufficient expertise to conclude claimant has the ability to be on his feet all day . . . .

21   Rather, an explanation of claimant's functional capacity from a doctor is needed.");

22   *Berrios v. Sec. of Health and Human Svcs.*, 796 F.2d 574, 576 (1st Cir. 1986) (stating that

23   "[w]e do not think the Appeals Council, composed of lay persons, was competent to

24   interpret and apply . . . raw, technical medical data.");  *Day v. Weinberger*, 522 F.2d 1154,

25   1156 (9th Cir. 1975) (stating that "the Hearing Examiner, who was not qualified as a

26   medical expert, should not have gone outside the record to medical textbooks for the

27   purpose of making his own exploration and assessment as to claimant's physical

28   condition").  More significantly, it would not be appropriate for an ALJ to reject a

1  physician's assessment of a claimant's ability to work based on his own interpretation of

2  an x-ray. *Naranjo v. Astrue*, 2010 WL 1277974, 151 Soc. Sec.Rep.Serv. 661 (D. Colo.

3  2010).

4       Here, the ALJ reached his conclusions about plaintiff's residual functional capacity

5  for sedentary work based on the opinions of medical professionals who were qualified to

6  interpret x-rays of plaintiff's elbow and knee and other pertinent medical data. Thus,

7  even if x-ray images were included in the record, it would not be appropriate for the ALJ

8  to reject the opinions of qualified medical professionals based on his own interpretation

9  of the x-ray images. Under these circumstances, it is not reasonably possible that

10  supplementing the record with x-ray images would have any effect whatsoever on the

11  outcome of plaintiff's disability claim. In other words, the x-ray images are not material

12  to the ALJ's disability analysis. Therefore, IT IS RECOMMENDED that the District

13  Court DENY plaintiff's Ex Parte Request to Supplement the Administrative Record

14  [Doc. No. 28].

15  ***VIII.   Conclusion.***

16       Based on a thorough review of the Administrative Record, this Court concludes

17  that substantial evidence supports the ALJ's decision that plaintiff does not qualify for

18  disability benefits because he is not disabled and retains the residual functional capacity

19  to perform his past relevant work as a transcriber/stenographer. In addition, the ALJ set

20  forth specific, clear, and convincing reasons for discrediting plaintiff's testimony that he

21  is disabled by pain and did not arbitrarily reject this testimony.

22       IT IS THEREFORE RECOMMENDED THAT THE DISTRICT COURT:

23       1.    GRANT defendant's Motion for Summary Judgment [Doc. No. 26] and

24  DENY plaintiff's Motion for Summary Judgment [Doc. No. 32];

25       2.    DENY defendant's Motion to Dismiss [Doc. No. 24];

26       3.    DENY plaintiff's Motion to Exclude Evidence [Doc. No. 30]; and

27       4.    DENY plaintiff's Request to Supplement the Record [Doc. No. 28].

28  / / /

16cv215-GPC(KSC)

1    This Report and Recommendation is submitted to the United States District Judge

2  assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1) and Civil Local

3  Rule 72.1(d).  Within fourteen (14) days after being served with a copy of this Report and

4  Recommendation, "any party may serve and file written objections."  28 U.S.C. §

5  636(b)(1)(B)&(C).  The document should be captioned "Objections to Report and

6  Recommendation."  The parties are advised that failure to file objections within this

7  specific time may waive the right to raise those objections on appeal of the Court's order.

8  *Martinez v. Ylst*, 951 F.2d 1153, 1156–57 (9th Cir.1991).

9    IT IS SO ORDERED.

10  Dated:  January 22, 2017

11

12                                   Hon. Karen S. Crawford
                                     United States Magistrate Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16cv215-GPC(KSC)