1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WALDO R. MEDINA, | CASE NO. 16CV215-GPC(KSC) |
| Plaintiff, | **ORDER ADOPTING REPORT AND RECOMMENDATION** |
| | **(1) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, [Dkt. Nos. 26, 32];** |
| v. | **(2) DENYING DEFENDANT'S MOTION TO DISMISS, [Dkt. No. 25];** |
| | **(3) DENYING PLAINTIFF'S MOTION TO EXCLUDE EVIDENCE, [Dkt. No. 30]; AND** |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | **(4) DENYING PLAINTIFF'S EX PARTE REQUEST TO SUPPLEMENT THE RECORD [Dkt. No. 28]** |
| Defendant. | |

   On January 28, 2016, Plaintiff Waldo Rene Medina ("Plaintiff"), proceeding *pro se*, filed a complaint seeking judicial review of a final decision of the Commissioner of Social Security ("Defendant" or "Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI").   On January 23, 2017, Magistrate Judge Karen Crawford issued a report and

recommendation ("Report") recommending Plaintiff's motion for summary judgment be denied, that Defendant's cross-motion for summary judgment be granted, that Defendant's motion for involuntary dismissal be denied and that Plaintiff's motion to exclude evidence and ex parte request to supplement the record be denied. (Dkt. No. 37.)  Plaintiff filed an objection on February 13, 2017. (Dkt. No. 38.)  After careful consideration of the pleadings, the supporting documents, and the applicable law, the Court **ADOPTS** in full the Magistrate Judge's Report.

### Procedural Background

On December 9, 2011, Plaintiff filed an application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act") and an application for supplemental security income ("SSI") under Title XVI of the Act.[1] (Administrative Record ("AR") 13, 180, 184).  In both applications, he alleged a disability beginning on August 10, 2002. (AR 13, 180, 184.) Both of Plaintiff's claims were denied at the initial level and again upon reconsideration.  (AR 13-22, 53-120.)

On December 11, 2013, Plaintiff appeared with counsel and testified before an Administrative Law Judge ("ALJ"). (AR 27-52.) On March 14, 2014, the ALJ issued a written decision finding that Plaintiff was not disabled as defined under both sections of the Act. (AR 13-22.)  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for a review of the decision on December 4, 2015. (AR 1-5.)

On January 28, 2016, Plaintiff, proceeding *pro se,* commenced the instant action seeking judicial review of Defendant's decision. (Dkt. No. 1, Compl.) On November 3, 2016, Plaintiff filed his motion for summary judgment which was filed *nunc pro tunc* to October 17, 2016.  (Dkt. No. 32.)  Plaintiff also filed an ex parte request to supplement the administrative record and a motion to exclude evidence. (Dkt. Nos. 28, 30.)  On October 19, 2016, without knowing that Plaintiff's motion for summary

---

[1] While the ALJ's decision states that the Title XVI application for supplemental security income was filed on November 8, 2011, the administrative record shows that both applications were filed on December 9, 2011. (AR 180, 184.)

judgment had been received by the Court, Defendant filed a motion to dismiss for involuntary dismissal for failing to prosecute and failing to comply with a court order. (Dkt. No. 25.)  Then, on October 28, 2016, Defendant filed its motion for summary judgment.  (Dkt. No. 28.)  On November 4, 2016, Defendant filed its opposition to Plaintiff's motion for summary judgment, ex parte request to supplement the administrative record and motion to exclude.  (Dkt. No. 33.)  On November 29, 2016, Plaintiff filed his opposition to Defendant's motion for summary judgment.  (Dkt. No. 36.)

On January 23, 2017, the Magistrate Judge issued the Report.  (Dkt. No. 37.) Plaintiff filed an objection on February 13, 2017.  (Dkt. No. 38.)

### Factual Background

Plaintiff alleges a disability as of August 10, 2002.  (AR 55.)   On his applications, he alleged a disability based on injury to left elbow and right leg/knee; shattered tibia and fibula, 2 steel plates; transplanted anterior crustate ligament with shattered tibia; shattered radius and ulna, 2 more steel plates; and turrets possibly due to anesthesia from broken leg surgery.  (AR 55, 67.)

### A.    Plaintiff's Testimony

At the hearing before the ALJ, Plaintiff was fifty-four years old.  (AR 30.)  He completed all the course work for an associate's degree but did not get the degree.  (Id.) He supports himself through "food stamps, medical testing, parents."  (AR 30-31.)  He has previous work experience as a clerk in a medical office and repaired laser printers. (AR 33-34.)  He lives alone, does his grocery shopping and takes the bus to run errands.  (AR 36.)  He uses a bicycle as a walker when he transfers between buses, and uses it in the grocery stores.  (Id.)  At the grocery store, he uses the basket on the handlebars of his bike to carry his groceries.  (Id.)  He only rides his bicycle on a flat road and not hills.  (AR 37.)  His doctors recommended that he ride a bicycle in order to maintain musculature around his structures and because biking has the least impact with the most benefit.  (AR 41.)

According to Plaintiff, he must limit his errands.  For example, he can do two errands in a day but if he does two errands in a day for three days out of the week, he will be unable to walk for a day or two and must scoot around on the carpet inside his home to get from place to place. (AR 37-38.)  So if he does one errand a day during the week, it is easier.  (AR 37.)  He also claims there are days when he is just laying in bed. (AR 37-38.)  Besides running one or two errands a day, he is home and does digital painting on a computer which only requires one hand and no keyboard.  (AR 38.)  He elevates his leg every time he is sitting or lying down at home.  (AR 38.)  As for walking it depends on how much he exerted the previous day but he can go half a block to a block and a half before he has a serious limp or serious pain.  (AR 39.)

He testified that he can stand about 10 to 15 minutes on one day, and if he does, then he cannot stand for the rest of the week.  (Id.)  After a day or two, he cannot even stand and scoots around his house.  (Id.)  Since his right leg is unstable, he loses his balance daily and uses walls to support himself.  (AR 39, 40.)  He says he does not shower or bathe since it's too risky due to instability problems so he puts "some water in the tub and wash[es] off that way."  (AR 40.)  He cannot take his laundry to the washing machine so he washes two shirts and two shorts at a time, and hang dries them. (AR 40.) At his hearing, he testified that he cannot sit for an 8 hour job because he has to get up every few hours or his leg stiffens. (AR 35.)  He asserts it takes about three and a half minutes for him to get up on his feet after sitting for a couple of hours and by the time he gets on his feet, he needs to sit back down again.  (Id.)  He does not take any pain medication.  (Id.)

Plaintiff also testified that his left arm, which previously required surgery, begins to hurt after typing for five or ten minutes.  (AR 48.)  The pain feels like the "nerve kind of damage" he has experienced in his knee.  (Id.)  After using his left arm for fine motor skills, such as typing, for 15 minutes he has to stop.  (AR 48.)  He can use his fine motor skills no longer than 15 minutes twice a day.  (AR 48-49.)  If he uses his fine motor skills twice in a day, then the next day, he cannot type.  (AR 48-49.)

[16CV0215-GPC(KSC)]

1  When he needs to lift something that weighs 10 to 15 pounds, plaintiff said he has to
2  "favor the other arm."  (AR 49.)

3        As to his Tourette syndrome, Plaintiff stated that when he got off pain
4  medication in 2003, he would have five or seven episodes a day until about 2010. (AR
5  41.)  Then the episodes began to taper off and he had not had one in the past few
6  months.  (Id.)  When he had episodes, it was very loud as his voice can carry.  (AR 42.)

7        At the hearing, Dr. Anthony E. Francis testified as the medical expert.  (AR 42.)
8  He testified that he could not tell how bad the Tourette's or tic disorder is but it is a
9  condition that can come and go and can be treated with medication.  (AR 42-43.)
10 Based on his review of Plaintiff's medical record, Dr. Francis testified that Plaintiff is
11 able to do sedentary work and his condition does not meet or equal a Listing.  (AR 46.)
12 Bonnie Sinclair testified as the vocational expert and concluded that Plaintiff could do
13 skilled, light and sedentary work because he can sit six to seven hours a day, write, type
14 or handle small objects six to seven hours a day and can carry 20 to 30 pounds twice
15 a month.  (AR 46-47.)

16 **B.    Medical Evidence**

17       The Court recites the medical evidence facts presented in the Report.  (Dkt. No.
18 37 at 6-15.)  The earliest medical treatment records are from August 21, 2002, and were
19 prepared by Rodney D. Henderson, M.D., an orthopedic surgeon, ten days after
20 plaintiff had surgery to repair a "comminuted, right, tibial plateau fracture" on his right
21 knee. (AR 325-26.)   At this time, plaintiff was reportedly "doing well" and was
22 "weaning off Vicodin."  (AR 326.)  X-rays showed "good alignment at the fracture
23 site" and "hardware in good position." (AR 326.)  In addition, Dr. Henderson reported
24 that there was "no pain with passive motion."  (AR 326.)

25       Thereafter, plaintiff had several follow-up appointments with Dr. Henderson.
26 On September 9, 2002, Dr. Henderson's treatment notes state that: "He is doing well.
27 He denies any pain at rest. He does report some sensation of a bone moving when he
28 moves his legs. . . . There is atrophy of the quadriceps. There is really no swelling at

1  the knee at all, and the incision is completely healed. . . . AP and lateral radiographs of

2  the tibia show no change in the hardware position or alignment.  There is still a little

3  varus[2] at the proximal fragment, but this is unchanged from the original x-rays." (AR

4  325.)  Dr. Henderson recommended that Plaintiff "continue non-weightbearing and

5  gentle range of motion up to 90 degrees as tolerated. . . ."  (AR 325.)

6       On October 14, 2002, two months after surgery, Dr. Henderson reported that

7  plaintiff was "doing well" and "denie[d] any pain."  (AR 324.)  At this time, Dr.

8  Henderson indicated plaintiff could begin to "toe-touch weight bear, and do straight

9  leg raises and quad sets." (AR 324.)  At the time of his follow-up appointment on

10  November 13, 2002, plaintiff reported he had been "trying to bear weight" but was

11  having some pain in the knee joint. (AR 323.) Dr. Henderson indicated plaintiff could

12  "wean out of the brace," "begin weightbearing," and "use a stationary cycle as

13  tolerated." (AR 323.)  Plaintiff continued to progress as indicated in Dr. Henderson's

14  notes dated December 16, 2002 (AR 322); January 27, 2003 (AR 321); and March 10,

15  2003 (AR 320).

16       Plaintiff had his final follow-up appointment with Dr. Henderson on June 18,

17  2003, ten months after his surgery.  (AR 319.) The treatment notes state that plaintiff

18  "is doing very well and over the last month his symptoms have markedly improved.

19  He denies any pain.  His main problem that he reports, which is very minor, is some

20  weakness when he descends stairs.  He has been cycling on a daily basis.  His

21  quadracep development has improved.  He has full flexion, full extension, and there is

22  no effusion in the knee. Clinically, there is just very mild varus compared to the

23  opposite knee which is also at slight varus. . . .  I will release him from my care.  I have

24  recommended that he avoid impact loading exercises.  He is certainly safer in

25  continuing cycling and swimming. . . ." (AR 319.)

26       On July 28, 2007, plaintiff went to the emergency room at Scripps Memorial

27

28       [2]"Varus" means "of, relating to, or being a deformity in which an anatomical part
is turned inward toward the midline of the body to an abnormal degree."
Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/vams.

Hospital after he fell off a bicycle and landed on his left side.  He had a "significant deformity to his left elbow." (AR 205.)  An X-ray revealed "a dislocation of the elbow and radial head, with a fracture of the proximal ulna that is comminuted."  (AR 306.)  His fracture was "aligned and splinted while he was sedated." (AR 306.)  On July 29, 2007, a detailed Operative Report indicates plaintiff had surgery on his left elbow because of a "comminuted unstable Monteggia fracture dislocation." (AR 302-304.)  He was discharged on July 31, 2007. (AR 301.)  Prior to surgery, Plaintiff was advised it was unlikely he would have "return of full range of motion of his elbow and forearm."  (AR 309.)

On August 3, 2007, shortly after the surgery on his elbow, plaintiff went to see Dr. Henderson seeking "reassurance" and a "second opinion." (AR 316.)  Plaintiff was known to Dr. Henderson, because he previously operated on plaintiff's knee.  (AR 316.)  At this time, Plaintiff's main concern was that he had been told he "may be at risk for dislocation in the future if his elbow comes out into terminal extension." (AR 316.)  Dr. Henderson examined plaintiff and was able to review his x-rays.  In addition, Dr. Henderson reviewed postoperative radiographs, which showed "essentially anatomic alignment with internal plate fixation with nice concentric joint alignment." (AR 317.)  He reassured plaintiff that his x-rays "look excellent." (AR 317.)  Dr. Henderson's written report also states as follows: "Theoretically, he is at risk for possibl[e] dislocation and extension secondary to the comminution of the comoid fragment; however, in my opinion the more likely scenario would be postoperative stiffness limiting full terminal extension which would most likely prevent any episodes of dislocation." (AR 317.)

Nine days after his surgery, on August 6, 2007, plaintiff had a follow-up appointment with David R. Hackley, M.D.  The treatment notes state that Plaintiff was "healing nicely." (AR 330.)  Dr. Hackley referred Plaintiff to physical therapy to "work on range of motion. . . ." (AR 330.)  On August 9, 2007, at the next appointment with Dr. Hackley, Plaintiff was "doing well" and his wound was "healing nicely." (AR

329.) Dr. Hackley adjusted the brace on plaintiff's arm "to allow him to range from 45 [degrees] to full flexion." (AR 329.) By the next visit on August 20, 2007, plaintiff reported that he had not yet gone to physical therapy. He said he was dealing with some "social issues" and had not had time to see the therapist. (AR 328.) He was still using a brace and the range of motion for his elbow was "30-120 [degrees]." (AR 328.) However, he had a full range of motion in his fingers and wrists. Dr. Hackley encouraged plaintiff to see the physical therapist to work on range of motion exercises. (AR 328.) Six weeks after surgery, on September 10, 2007, Dr. Hackley reported that Plaintiff was still "doing well" and working on his range of motion. His x-rays showed "further healing" with "[n]o evidence of subluxation on the static views." (AR 327.)

Progress notes, dated January 28, 2010, by Denise L. Parnell, M.D., Family Health Centers of San Diego, indicate that Plaintiff had a routine medical examination and requested to have a form filled out for food stamps. (AR 379.) During the examination, Plaintiff reported that he still had pain in his elbow and leg, and his leg swelled if he walked a mile. (AR 379.) He also said he had Tourette syndrome that was "mostly in remission." (AR 379.)

On September 16, 2010, Plaintiff had another routine medical examination at Family Health Centers of San Diego and needed a form filled out for social services. (AR 378.) At this time, Plaintiff reported that he could walk a mile before his knee became painful. There was no swelling in his knee or elbow. (AR 378.) His next appointment at Family Health Centers of San Diego was on October 6, 2010. At this time, Plaintiff was requesting "disability certification" because of his knee and elbow injuries. (AR 377.) He was not taking any pain medication at this time. (AR 377.) Plaintiff was advised that his records would be requested from Scripps to determine whether he needed "a referral for ortho" and to assess whether he is disabled. (AR 377.) In a later follow-up appointment at Family Health Centers of San Diego on June 24, 2011, Plaintiff again requested disability certification for "chronic knee pain" and reported he could walk a half a mile with difficulty. However, the attending physician,

Amish Chipwadia, M.D., reviewed plaintiff's "ortho records" and "denied" disability. (AR 375.)

On April 2, 2012, Plaintiff appeared for a psychiatric consultative examination by Gregory M. Nicholson, M.D., a Board Certified Psychiatrist. (AR 337-42.) Dr. Nicholson's report says plaintiff's "chief complaint" is anxiety. (AR 337.) Plaintiff told Dr. Nicholson that he lives alone, and his activities of daily living include cooking and laundry. He had no difficulty with dressing, bathing, or personal hygiene. Although he did not drive because he did not have a vehicle, he was able to go out alone. He was able to handle cash and bills appropriately. (AR 339.) The results of a mental status examination were normal, but plaintiff's mood and affect were anxious. He appeared to be of average intelligence, and his memory was intact. His insight, judgment, and "fund of knowledge w[ere] grossly intact." (AR 340-41.)

Based on his examination of Plaintiff, Dr. Nicholson concluded that Plaintiff is able to understand, remember, and carry out simple one or two-step job instructions as well as detailed and complex instructions. (AR 341.) In addition, Dr. Nicholson concluded Plaintiff has an unlimited ability to accept instructions from a supervisor and perform work activities without special supervision. (AR 342.) However, his ability to relate and interact with co-workers and the public and his ability to maintain concentration, attention, persistence, and pace are "mildly limited." (AR 341.) His ability to maintain regular attendance was also "mildly limited." (AR 342.)

On April 10, 2012, at the request of the Department of Social Services in connection with Plaintiff's disability claim, Plaintiff had x-rays and an orthopedic consultation, which resulted in written reports by T. Divakaran, M.D., a Radiologist, and Thomas J. Sabourin, M.D., a Board Certified Orthopedic Surgeon. (AR 344-49.) Dr. Divakaran's Radiology Report concludes as follows with respect to plaintiff's left elbow: "Internal fixation plate and screws in the proximal ulna with healed fracture. Post-traumatic osteoarthritis of the elbow joint." (AR 349.) With respect to Plaintiff's right knee/leg, the Radiology Report concludes as follows: "Internal fixation plate and

screws in the proximal tibia with healed fracture which appears to have extended into the lateral tibial plateau." (AR 349.)

Dr. Sabourin's report states that Plaintiff "took a bike and bus to the evaluation today." (AR 344.) Plaintiff reported pain in his left elbow and right knee as a result of "three significant bicycle accidents" which resulted in injuries to his right knee and left elbow that both needed surgical repair. (AR 344.) He said his right knee is painful when he walks and his elbow is doing "relatively well," but he "gets some pain" after typing more than 20 minutes. (AR 344.) He was not receiving any medical treatment or using assistance devices for these problems. (AR 344.) Dr. Sabourin completed a physical examination and reported that Plaintiff "sits and stands with normal posture;" "sits comfortably during the examination;" "rises from a chair without difficulty;" "has no assistance devices;" and has a normal gait and toe heel walking. (AR 345.) Dr. Sabourin also noted that Plaintiff had a normal range of motion in his spine, hips, shoulders, wrists, hands, fingers, ankles, and feet. (AR 346-47.) A neurological examination was also normal except for some decreased sensation near the surgical scar on Plaintiffs right leg. (AR 347.) However, Dr. Sabourin's report states that: "There is a 2+ varus instability in the right knee. He has some tenderness over the medial aspect of the right knee. There is no redness, swelling, or gross effusion and there is no significant crepitus. He has a varus deformity in the right knee." (AR 346.) Dr. Sabourin also reviewed the x-rays that were taken on the day of the appointment. (AR 347.)

Based on his examination, Dr. Sabourin concluded that Plaintiff does have "problems with his right knee and left elbow." (AR 348.) Dr. Sabourin's report also states that: "The left elbow is not too significant [of a] problem. He seems to be getting by with it quite well. The right knee, however, is significant and I feel it does give him significant limitations." (AR 348.) As a result, Dr. Sabourin concluded as follows:

> I feel he could only lift and carry 20 pounds occasionally and 10 pounds frequently with this knee. He could stand and walk up to two hours in an eight-hour workday and sit for six hours in an eight-hour workday. Push and pull limitations will be equal to lift and carry

limitations. He is unable to walk on uneven terrain with that knee. He could climb, kneel and crouch only occasionally with that knee. His left elbow is doing well enough that I do not feel he has any significant manipulative limitations, but he could do gross manipulation such as handling, torqu[e]ing, and grasping with the left elbow only frequently. He does not use any assistive devices.

(AR 348.)

During an appointment at Family Health Centers of San Diego on February 22, 2013, Plaintiff complained of chronic pain in his right knee and left elbow, and x-rays were ordered. (AR 364-365.) X-rays were completed on April 3, 2013 and were reviewed by Derrick Allen, M.D., who prepared a detailed report of his findings. As to plaintiff's right knee, Dr. Allen's x-ray findings and conclusion state as follows:

1. Intact orthopedic side plate [within the] lateral tibial plateau. Marked irregularity involving the articular surface of the tibial plateau.
2. Moderate size joint effusion.
3. Moderate to severe patellofemoral degenerative change.

(AR 382.)

As to plaintiff's elbow, Dr. Allen's conclusions for the x-rays completed on April 3, 2013 state as follows:

CONCLUSION:

1. Olecranon orthopedic plate as described above.
2. Triangular osseous density between the radial head and capitellum could potentially represent a loose body. This finding is only appreciable on the oblique view. Correlation with any prior radiographs would be of benefit. CT scan may also be beneficial.
3. No acute fracture line or evidence of joint effusion.

(AR 393.)

As a result of the x-rays completed on April 3, 2013, Family Health Centers of San Diego referred Plaintiff to an orthopedic surgeon for a consultation. (AR 359-60; 362-63.) He testified that the Family Health Centers of San Diego sent him to a specialist, Dr. Joel Smith, before they could make a diagnosis. (AR 32.) On August 1, 2013, plaintiff had an appointment with Joel J. Smith, M.D., for a disability evaluation based on his prior right knee and left elbow injuries. (AR 398.) At this time, Plaintiff complained of moderate to severe burning pain in his right knee which

varied from day to day. (AR 398.) Dr. Smith acknowledged that Plaintiff suffered from joint pain. However, the results of his examination were within normal ranges. (AR 398-99.) With respect to Plaintiff's left elbow, Dr. Smith noted that there were "no deformities of misalignment of bones, swelling," and no "signs of muscle atrophy." (AR 398.) Dr. Smith also noted as follows: "The carrying angle of the lower arms is symmetrical. The bony landmarks of the two elbows are aligned." (AR 399.) "Range of motion testing of the elbow reveals no restriction or instability related to ligamentous laxity." (AR 399.) "Range of motion in flexion is approximately 130 degrees." (AR 399.) "Range of motion in extension is approximately 30 degrees." (AR 399.) With respect to Plaintiff's right knee, Dr. Smith's report states as follows: "The alignment of the knee and patella are normal; there is no varus or valgus [misalignment of the knee or rotational [mis]alignment of the patella." (AR 399.) "Range of motion testing of the knee reveals no restriction or instability related to ligamentous laxity." (AR 399.) "Strength testing of the major motor muscles of the knee is graded at 5/5." (AR 399.)

At his next appointment at Family Health Centers of San Diego on October 15, 2013, Plaintiff indicated he did not know the results of his orthopedic consultation. (AR 357.) At this time, Plaintiff was taking medication to control high blood pressure, but there is nothing to indicate he was taking any medication for chronic pain in his knee or elbow. (AR 357-58.)

### The ALJ's Decision

In order to determine whether a claimant meets the definition of disabled, the ALJ employs a five-step sequential evaluation. 20 C.F.R. § 416.920(a); Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir. 2012). If the ALJ determines that a claimant is either disabled or not disabled at any step in the process, the ALJ does not continue on to the next step. See 20 C.F.R. § 416.920(a)(4); Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1222 (9th Cir. 2009). In brief, the ALJ considers whether a claimant is disabled by determining: (1) whether the claimant is "doing substantial gainful

[16CV0215-GPC(KSC)]

activity"; (2) whether the claimant has a "severe medically determinable physical or mental impairment" or combination of impairments that has lasted for more than 12 months; (3) whether the impairment "meets or equals" one of the listings in the regulations; (4) whether, given the claimant's residual functional capacity ("RFC"), the claimant can still do his or her "past relevant work"; and (5) whether the claimant "can make an adjustment to other work." 20 C.F.R. § 416.920(a).  Between steps three and four, the ALJ must, as an intermediate step, assess the claimant's RFC.  See 20 C.F.R. § 416.920(e); Bray, 554 F.3d at 1222-23.  The burden of proof is on the claimant at steps one through four, but shifts to the Commissioner at step five.  Bray, 554 F.3d at 1222.

The ALJ applied the five-step sequential framework to determine that Plaintiff is not disabled. (AR 15-22.)  First, the ALJ determined that Plaintiff met the insured statute requirements through September 30, 2007. (AR 15.)  Then, at step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since August 10, 2002, the alleged onset date of disability.  (Id.)  At step two, the ALJ found that Plaintiff has severe physical impairments of "a Tic disorder/Tourette's Syndrome; status post anterior cruciate ligament reconstruction, right knee; status post open reduction, internal fixation (ORIF) of the lateral tibial plateau compression fracture, right knee; residual medial instability of the right knee; moderate degenerative joint disease of the right knee and status post ORIF of Monteggia fracture, left elbow (20 CFR 404.1520(c) and 416.920(c))."  (Id.)  At step three, the ALJ found that Plaintiff does not have an "impairment or combination of impairment that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart. P, Appendix 1." (Id. at 17.)  At step four, the ALJ determined that Plaintiff has the RFC to perform the full range of sedentary work as defined in 20 C.F.R. §§ 404.1267(a) and 416.967(a), and he can lift and carry 10 pounds, sit for six hours in an eight-hour

[16CV0215-GPC(KSC)]

1   workday, and stand/walk for six hours in an eight-hour workday.[3]   (Id.)   Given
2   Plaintiff's RFC, the ALJ determined that Plaintiff is capable of performing his past
3   relevant work as a stenographer transcriber  which "does not require the performance
4   of work-related activities precluded by the claimant's residual functional capacity."
5   (Id. at 21.)  Therefore, the ALJ concluded that Plaintiff has not been under a disability
6   as defined under the Social Security Act since August 10, 2002 through the date of the
7   decision of March 14, 2014.  (Id. at 22.)

8                                    **DISCUSSION**

9   **A.      Standard of Review of Magistrate Judge's Report**

10          The district judge must "make a *de novo* determination of those portions of the
11   report . . . to which objection is made," and "may accept, reject, or modify, in whole or
12   in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b);
13   Fed. R. Civ. P. 72(b).  The district court need not review *de novo* those portions of a
14   Report to which neither party objects.  See Wang v. Masaitis, 416 F.3d 992, 1000 n.
15   13 (9th Cir. 2005); U.S. v. Reyna-Tapia, 328 F.3d 114, 1121-22 (9th Cir. 2003) (*en*
16   *banc*).  Plaintiff filed an objection to the Report; therefore, the Court makes a de novo
17   review of the portions of the Report to which Plaintiff objects.  (Dkt. No. 38.)

18   **B.      Defendant's Motion for Involuntary Dismissal for Failure to Prosecute**

19          On October 19, 2016, Defendant filed a motion to dismiss for failure to
20   prosecute and failing to comply with the Court's scheduling order pursuant to Federal

21
22
23   _____

24          [3]The Court notes that the ALJ incorrectly assessed the RFC concerning
     Plaintiff's ability to "stand/walk for six hours in an eight-hour day." (AR 17.)  The
25   ALJ gave significant weight to Dr. Sabourin, the examining physician. (AR 21.)  Dr.
     Sabourin noted the significant limitations in Plaintiff's knee and opined that Plaintiff
26   retained the capacity to "stand/walk for two hours in an eight-hour workday", not six
     hours in an eight-hour workday. (AR 19, 348.)  The error may have been an oversight.
27   However, the ALJ's error is harmless as it is "inconsequential to the ultimate
     nondisability determination", see Robbins v. Soc. Sec. Admin., 466 F.3d 880, 885 (9th
     Cir. 2006) (quoting Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1055-56 (9th
28   Cir. 2006)), since his past relevant work as a transcriber/stenographer does not require
     any significant periods of standing or walking.

1    Rule of Civil Procedure ("Rule") 41(b)[4] and Local Civil Rule 41.1.[5]  (Dkt. No. 25.)
2    Plaintiff filed an opposition arguing that he made his best attempt to file his motion for
3    summary judgment which he confirmed with the Clerk's office and denies having
4    violated any local rule.  (Dkt. No. 36 at 1.)  The Report noted that because Plaintiff is
5    proceeding *pro se,* he did not comply with the Court's briefing schedule and may have
6    neglected to serve defense counsel with some of the moving papers; however, these
7    actions do not constitute "extreme circumstances" that would justify an involuntary
8    dismissal under Rule 41(b) and recommended that the Court deny Defendant's motion.
9    No objection to the Report concerning the motion for involuntary dismissal was filed.

10        A dismissal pursuant to Rule 41(b) "is so harsh a penalty it should be imposed
11   as a sanction only in extreme circumstances."  Lal v. California, 610 F.3d 518, 525 (9
12   Cir. 2010) (citation omitted).  The Court agrees with the Magistrate Judge that
13   Plaintiff's failing to timely comply with the Court's briefing schedule and service of
14   briefs do not constitute extraordinary circumstances to justify dismissal under Rule
15   41(b).  Moreover, the docket reveals that the Court received Plaintiff's motion for
16   summary judgment on October 17, 2016 but it did not get filed until November 3,
17   2016.  Therefore, when Defendant filed its motion for involuntary dismissal on October
18   19, 2016, it was not aware the Court was in receipt of Plaintiff's motion for summary
19   judgment.  Although Plaintiff's motion was not timely filed on October 3, 2016, a delay
20   of fourteen days, by a pro per litigant, does not constitute an extreme circumstance to
21   justify denial.  Thus, the Court ADOPTS the report and recommendation denying
22   Defendant's motion for involuntary dismissal.

23   **C.    Standard of Review of Commissioner's Final Agency Decision**

24        A district court has jurisdiction to review final decisions of the Commissioner

25   _____

26        [4]Rule 41(b) provides that "[i]f the plaintiff fails to prosecute or to comply with
27   these rules or a court order, a defendant may move to dismiss the action or any claim
     against it."  Fed. R. Civ. P. 41(b).

28        [5]"Failure to comply with the provisions of the local rules of this court may also
     be grounds for dismissal under this rule."  Local Civ. R. 41.1(b).

[16CV0215-GPC(KSC)]

of Social Security. 42 U.S.C. § 405(g). Section 405(g) permits the court to enter a judgment affirming, modifying, or reversing the Commissioner's final decision. Id. The matter may also be remanded to the Commissioner for further proceedings. Id. The scope of judicial review is limited, and the Commissioner's final decision should not be disturbed unless it is "not supported by substantial evidence or it is based on legal error." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (internal quotations and citations omitted); Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008) (court "will disturb the denial of benefits only if the decision contains legal error or is not supported by substantial evidence.") Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 690 (9th Cir. 2009) (internal quotations and citations omitted). The evidence must be "more than a mere scintilla," but may be less than a preponderance. Id. Even when the evidence is susceptible to more than one rational interpretation, the court must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record. Tommasetti, 533 F.3d at 1038. Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that "the ALJ's error was 'inconsequential to the ultimate nondisability determination.'" Robbins v. Soc. Sec. Admin., 466 F.3d 880, 885 (9th Cir. 2006) (quoting Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1055-56 (9th Cir. 2006)).

For purposes of the Social Security Act, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "This provision establishes a severity and durational requirement for recognition of disabilities under the Act that accords with the remedial purpose of the Act to protect workers whose disability prevents them from earning a living for a significant period of time." Flaten v. Sec. of Health & Human Servs., 44

[16CV0215-GPC(KSC)]

F.3d 1453, 1459 (9th Cir. 1995).

**D.     Date Last Insured**

Defendant argues that Plaintiff is not eligible for disability insurance benefits since his application was filed over four years after his insured status expired.

Plaintiff's date last insured was September 30, 2007.  (AR 15, 273.)  Plaintiff alleges a disability starting on August 10, 2002.  (AR 13, 273.)  Plaintiff filed his applications for DIB and SSI in December 2011.  (AR 273.)

To be entitled to disability benefits, Plaintiff must establish his disability existed on or before his date last insured date.  Tidwell v. Apfel, 161 F. 3d 599, 601 (9th Cir. 1998).  In the case as here where Plaintiff applied for benefits after the expiration of his insured status, he must show a continuous disability from the time of onset during insured status to the time of application for benefits.  Flaten, 44 F.3d at 1460 ("The statutory schema thus requires that a disability be continuously disabling from the time of onset during insured status to the time of application for benefits, if an individual applies for benefits for a current disability after the expiration of insured status.").

Here, Plaintiff alleges a continuous disability from the date of disability to even the present day.  Defendant acknowledges that if Plaintiff filed an application after the expiration of his insured status, he must show his disability existed continuously since sometime on or before the date last insured.  Therefore, Plaintiff must demonstrate a continuous period of disability on or before his date last insured, of September 30, 2007, until the time of his DIB and SSI applications filed on December 9, 2011.

**E.     Analysis**

**1.     Consultative Examining Physicians**

In the motion for summary judgment and objections, Plaintiff does not challenge the ALJ's decision but directly challenges the medical reports of non-treating examining physicians Drs. Sabourin and Smith.  To the extent he challenges these reports, he should have raised them during the administrative process in order to preserve them on appeal and since he did not raise the issue before the Commissioner,

1  he cannot challenge their reports directly on appeal.  See Meanel v. Apfel, 172 F.3d

2  1111, 1115 (9th Cir. 1999) ("at least when claimants are represented by counsel, they

3  must raise all issues and evidence at their administrative hearings in order to preserve

4  them on appeal.").  To the extent he challenges the underlying basis of the ALJ's

5  conclusion relying on the consultative examining physicians, the Court liberally

6  construes Plaintiff's argument as challenging the ALJ's reliance on these doctors to

7  support his decision.

8      The Ninth Circuit distinguishes among the "opinions of three types of

9  physicians: (1) those who treat the claimant (treating physicians); (2) those who

10  examine but do not treat the claimant (examining physicians); and (3) those who

11  neither examine nor treat the claimant (nonexamining physicians)."  Lester v. Chater,

12  81 F.3d 821, 830 (9th Cir. 1996).  In general, more weight should be given to the

13  treating physician's opinion than to the opinion of doctors who do not treat the

14  claimant.  Id. (citing Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987)).

15      "To reject an uncontradicted opinion of a treating or examining doctor, an ALJ

16  must state clear and convincing reasons that are supported by substantial evidence."

17  Bayliss v. Barnhart, 417 F.3d 1211, 1216 (9th Cir. 2005) (citing Lester, 81 F.3d at 830-

18  31).  "If a treating or examining doctor's opinion is contradicted by another doctor's

19  opinion, an ALJ may only reject it by providing specific and legitimate reasons that are

20  supported by substantial evidence."  Id.  However, if the treating physician failed to

21  give an opinion or the treating physician's opinion does not conflict with the non-

22  treating physician's opinion, that burden is not triggered.  See Arago v. Astrue, No. C-

23  09-3603-EMC, 2010 WL 1948620 at *4 (N.D. Cal. May 13, 2010), aff'd, 457 Fed.

24  App'x 700 (9th Cir. 2011) ("[T]o reject the opinion of a treating physician in favor of

25  a conflicting opinion . . . an ALJ . . . must make findings setting forth specific,

26  legitimate reasons . . . based on substantial evidence in the record . . . [but] the above

27  burden is not triggered [when] there is no conflict with a treating physician's opinion.")

28  (internal quotations omitted).

[16CV0215-GPC(KSC)]

Plaintiff argues that the consulting doctors' assessment of the degree of his varus deformity is contradicted by his treating physician. Dr. Henderson, Plaintiff's treating orthopedic surgeon, concluded that he had a "varus" of 10-11 degrees on January 27, 2003. (AR 321.) In contrast, in 2012, Dr. Sabourin noted only a 2+ degree of varus while Dr. Smith, in 2013, noted no varus deformity. He claims both consulting doctors did not measure his leg to make their varus assessments. He claims his right leg is significantly disfigured, his varus has not changed over time and remains measured at 10-11 degrees. He claims the degree of the varus is important because his weight which is normally supported by both knees is only supported by one knee. Plaintiff argues the ALJ should have rejected the reports as inconsistent and inaccurate.

In his decision, the ALJ gave significant weight to the opinion of the consultative examiner, Dr. Sabourin, because his report contains detailed clinical findings supporting his medical opinions and medical source statements. (AR 21.) While the ALJ cited to the opinion of Dr. Smith, the ALJ did not give it significant weight. (AR 19.)

Contrary to Plaintiff's argument that there are inconsistent varus assessments between his treating physician and the examining consulting doctors, the record demonstrates that the reports are not inconsistent.

On September 9, 2002, the treating physician, Dr. Henderson wrote "[t]here is still a little varus at the proximal fragment, but this is unchanged from the original x-rays." (AR 325.) On January 27, 2003, Dr. Henderson, wrote his "alignment with weightbearing appears fairly normal . . . has mild varus in both knees. . .still has about 10-11 degrees of varus of the articular surface to the shaft." (AR 321.) On June 18, 2003, ten months after his surgery, Dr. Henderson wrote, "He has full flexion, full extension, and there is no effusion in the knee. Clinically, there is just very mild varus compared to the opposite knee which is also at slight varus." (AR 319.)

Almost ten years later, on April 10, 2012, Dr. Sabourin, at the direction of the Department of Social Services, conducted a consultative exam of Plaintiff. (AR 344-

48.)  Upon examination, Plaintiff sat and stood with normal posture and rose from a chair without difficult; his gait was normal and used no assistive devices.  (AR 345.) He stated there was a "2+ varus instability in the right knee."  (AR 346.)  He took x-rays of Plaintiff's left elbow and knee.  (AR 347-48.)  The x-ray showed "significant varus deformity."  (AR 348.)  Dr. Sabourin concluded that the knee gives Plaintiff significant limitations.  (AR 348.)  Based on his exam, Dr. Sabourin concluded that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently with his knee.  He could stand and walk up to two hours in an 8 hour day and sit for six hours in an 8 hour work day. (AR 348.)  Dr. Sabourin acknowledged that he could not walk on uneven terrain with the knee but he could climb, kneel and crouch occasionally with the knee.  (AR 348.)   Dr. Smith, on August 1, 2013, assessed there was no varus misalignment of the knee.  (AR 399.)

The opinions of Dr. Hendersen and Dr. Sabourin concerning varus deformity do not appear to be inconsistent.  Dr. Henderson assessed Plaintiff's varus deformity in varying degrees as "mild," "10-11 degrees," and "slight."  Dr. Sabourin noted a 2+ varus instability, and based on the x-ray, noted that Plaintiff's varus deformity was "significant."  Both Dr. Henderson and Dr. Sabourin recognized the significance of Plaintiff's varus deformity, but Dr. Sabourin still concluded that Plaintiff was able to perform sedentary work.  Plaintiff has not demonstrated that the ALJ should have rejected the opinion of Dr. Sabourin.  As to Dr. Smith, the ALJ did not significantly rely on the opinion of Dr. Smith, who was referred by the State Agency noting that the its determination differed from the Commissioner's.  (AR 21 ("State Agency determination found that the claimant is more functional than the residual functional capacity found herein".) Plaintiff's argument concerning inconsistent medical opinions is without merit.

## 2. Tourette Syndrome

Plaintiff next argues that his Tourette's syndrome was at its worst at the beginning after his August 2002 surgery and has slowly improved. (Dkt. No. 38 at 4.)

[16CV0215-GPC(KSC)]

1  While he acknowledges improvement by 2010, he claims it was not better through the
2  date last insured in September 2007.  (Id.)  At that time, Tourette's was the "largest
3  obstacle" to returning to work.  (Id.)

4       In March 2006, Plaintiff was being threatened by his homeowner's association
5  due to his Tourette's syndrome, a vocal tic causing him to make loud noises in his
6  home. (AR 331-32.)  In May 2006, he is "[s]till having problems yelling, tic like in the
7  middle of the night, or when he wakes up in the am." (AR 334.)  In December 2006,
8  his neighbors were upset about his Tourette's but the frequency has decreased
9  markedly. (AR 334. )  Previously, it was occurring 2 or 3 times a night and 4 or 5
10 times a day but now it does not occur at night anymore. (AR 334.)  In September 2007,
11 the frequency of his outbursts has decreased to three times a month while before it was
12 three to five times a month. (AR 336.)  By 2010, his episodes have tapered off. (AR
13 41.)

14      Despite the severity of his Tourette's syndrome sometime in 2007, under the Act,
15 Plaintiff must demonstrate continuous disability from on or before the date last insured,
16 September 2007, until the filing of his application in 2011.  The medical records show
17 that his Tourette's improved throughout 2007 with it occurring three times a month by
18 September 2007.  Plaintiff testified his episodes tapered off by 2010.  Therefore, he
19 cannot demonstrate the durational requirement of disability as to his Tourette's
20 syndrome.

21     **3.**    **Plaintiff's Subjective Pain Testimony**

22      Plaintiff argues that the ALJ and the Magistrate Judge did not consider the
23 severity of his testimony of how far he could walk, how he stands, how long he could
24 type especially in light of the overwhelming evidence of injury.

25      In deciding whether to accept a claimant's subjective pain or symptom
26 testimony, an ALJ must perform a two step analysis. Smolen v. Chater, 80 F.3d 1273,
27 1281 (9th Cir. 1996).  First, the ALJ must assess "whether the claimant has presented
28 objective medical evidence of an underlying impairment 'which could reasonably be

expected to produce the pain or other symptoms alleged.'" Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007).  Second, if the first test is met and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so. Smolen, 80 F.3d at 1281.  The ALJ determines "credibility, resolve conflicts in the testimony, and resolve ambiguities in the record."  Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1098 (9th Cir. 2014).

Here, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible . . . ."  (AR 20.)  The ALJ did not address any affirmative evidence of malingering.  See Morgan, 169 F.3d at 599 (without affirmative evidence of malingering, the Commission must provide clear and convincing reasons for rejecting claimant's testimony).  Therefore, since the first step has been met, the ALJ must present specific, clear and convincing findings to reject Plaintiff's subjective pain testimony.  See Smolen, 80 F.3d at 1281.

General findings are not sufficient; "the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints."  Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015).  The decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to . . . any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  Id.; see Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993) ("[An ALJ] must state which pain testimony is not credible and what evidence suggests the claimant[ ] [is] not credible.").  The ALJ must provide "specific, cogent reasons for the disbelief" when it rejects the claimant's complaints.  Lester v Chater, 81 F.3d 821, 834 (9th Cir. 1995) ("General [credibility] findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints.").

[16CV0215-GPC(KSC)]

An "ALJ may not discredit pain testimony merely because a claimant's reported degree of pain is unsupported by objective medical findings." Stewart v. Sullivan, 881 F.2d 740, 743-44 (9th Cir. 1989). In determining whether to reject pain testimony, the ALJ may consider a "claimant's daily activities, inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and relevant character evidence." Bunnell, 947 F.2d at 346-47. The regulations provide that the Commissioner will consider the following factors relevant to pain symptoms,

> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3). In addition, the ALJ "[m]ay consider a range of factors in assessing credibility, including (1) 'ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) that claimant's daily activities.'" Ghanim v. Colvin, 763 F.3d 1154, 1163 (9th Cir. 2014) (quoting Smolen, 80 F.3d at 1284).

The Magistrate Judge concluded that the ALJ provided specific, clear and convincing reasons to reject Plaintiff's pain testimony based on the lack of objective medical evidence, the conservative course of Plaintiff's treatment, the record does not support his alleged physical limitations and special accommodations and his ability to attend to routine daily activities. (Dkt. No. 37 at 25-29.)

Plaintiff objects arguing that he has pain "to the point of disability" because he

[16CV0215-GPC(KSC)]

sits or lays down more than 23 hours a day, and that he has not been able to attend to all routine daily activities. He argues that the fact he does not take medication should not be a factor in determining his disability since he would not be allowed to return to work if he were on pain medication. (Dkt. No. 38 at 4.) He also claims that pain medication used for osteoarthritis can lead to a need for further medication and damage and therefore, he does not take medication and that is why he is at his bed/desk most of the time to reduce pain.

In discrediting Plaintiff's allegations of pain, the ALJ first concluded the fact that Plaintiff's allegation of an inability to work due to knee and elbow pain was not supported by the objective medical evidence. (AR 20.) The medical evidence revealed "no significant focal deficits", he is "able to walk and move in a satisfactory manner", "although he used assistive devices postoperatively in the past, there is no indication of any medical necessity for an ongoing need for any assistive devices", "no significant muscle weakness or any indication of loss of control or muscle wasting in the arms and legs due to any nerve damages" and "no signs of muscle atrophy." (Id.) The ALJ found that Plaintiff's alleged complaints concerning the frequency and intensity of his pain, which are primarily subjective, are not corroborated by the medical evidence. (Id.) Despite his claims of disabling impairment, the objective medical evidence shows that Plaintiff's "impairments do not significantly restrict daily function nor do they restrict the claimant from performing usually work-related activities." (AR 20.)

Next, the ALJ noted that despite his multiple surgeries, he has had conservative treatment for his knee and elbow injuries. (AR 20.) While he used assistive devices postoperatively in the past, there is no medical need to ongoing use of any assistive devices. (AR 20.) The ALJ also noted that Plaintiff does not take any medications and when he took prescribed medication after his surgery, it was successful in controlling his symptoms. (Id.)

As to his alleged mental impairment, the medical evidence shows he is able to think and communicate and has no limitations in understanding, remembering and

[16CV0215-GPC(KSC)]

carrying out simple one or two step instruction, and even detailed and complex instructions, accept instructions from supervisors and perform work activities without special supervision.  (AR 20-21.)

Next, as to daily living, the ALJ determined that his daily activities establish a level of functioning greater than he alleges.  (AR 21.)  He is able to conduct routine daily activities such as cooking his own meal and do laundry, is able to go out alone and can handle bills and cash without assistance.  (AR 21.)  In sum, the ALJ concluded that allegations of disabling pain and limitation are not consistent with the record and not fully credible.  (Id.)

Contrary to Plaintiff's claim, whether Plaintiff takes pain medication is a factor the ALJ may consider in assessing Plaintiff's subjective pain.  See 20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3); Centeno v. Barnhart, 161 F. App'x 642, 643 (9th Cir. 2005) (refusal to take pain medication was a factor in not fully crediting the severity of the claimant's symptoms).  Moreover, Plaintiff now alleges that he is in such pain to the point that he is "either seated or laying down more than 23 hours a day." (Dkt. No. 28 at 38.)  However, Plaintiff's present condition is not relevant as to whether he was disabled at the relevant time period.

In sum, the ALJ provided specific, clear and convincing reasons supported by substantial evidence to reject Plaintiff's statement concerning the intensity, persistence and limiting effects of these symptoms to discount his subjective pain testimony. (AR 21.)

### 4.    Vocational Expert Testimony

For the first time in his objection, Plaintiff challenges the ALJ's conclusion that he can do his past relevant work as a stenographer/transcriber which requires six to seven hours typing.  (Dkt. No. 38 at 1-2.)  The Court "has discretion, but is not required, to consider" arguments presented for the first in an objection to a magistrate judge's recommendation.  See United States v. Howell, 231 F.3d 615, 621 (9th Cir. 2000), cert. denied, 534 U.S. 831 (2001) (concerning evidence presented for the first

time in an objection); <u>Carroll v. Kirkland</u>, No. CV 05-5347 SVW(JC), 2011 WL 3652242, at *1 (C.D. Cal. Aug. 17, 20110 (declining to consider new arguments raised for the first time in objections). Here, the Court exercises its discretion and considers Plaintiff's argument, raised for the first time in his Objections, about the vocational expert testimony.

Plaintiff agrees with the record that in his prior job as a transcriber, he used to sit 6-7 hours a day and wrote, typed and handled small objects 6-7 hours a day. (Dkt. No. 38 at 1-2.) He objects to the hypothetical posed by his attorney asking whether he can do the job of a transcriber if he can only type for 50% of the day, which was not a statement of his actual limitation. (Dkt. No. 38 at 2-3.) In essence, Plaintiff claims that the ALJ's assessment that he can perform his past relevant work is contrary to the evidence in the record that he can only type for a limited time each day. For example, at the hearing, he testified that he cannot conduct any fine motor skills any longer than 15 minutes at time with a maximum of twice a day. (AR 48-49.) Therefore, the hypothetical of he being able to type 50% of the work day is not supported by the record. Plaintiff further claims he was disabled from the time of his elbow injury in July 2007, which was before the date last insured of September 30, 2007, and therefore, he meets the requirement for a disability.

On a Work History form, plaintiff indicated he worked as a "clerk" in a medical office from 1980 to August 2002. (AR 209.) He described this job as follows: "Transcribe and type Dr.'s voice record of medical files, file & retrieve said files. Some phone work." (AR 47, 210.) He also indicated he was required to lift and carry "boxes of expired files for disposal weighing approx. 20 to 30 lbs, about twice a month or so." (AR 47, 210.) The vocational expert, Bonnie Sinclair testified that Plaintiff's past relevant work as a stenographer/transcriber is generally considered "skilled sedentary work" and requires a person to sit six to seven hours per day to write, type, or handle small objects. (AR 46-47.) However, the particular job that plaintiff previously held fits in the category of light work, because he was required to lift file boxes weighing 20 to

[16CV0215-GPC(KSC)]

30 pounds about twice per month. Plaintiff's counsel asked Sinclair if an individual who was only able to perform fine motor movements 50 percent of the day would be able to perform the job of transcriber. (Id.) Sinclair responded that the job of a transcriber, according to the DOT, requires reaching, handling, and fingering frequently (i.e., between 33 and 66 percent of the work day). (AR 50.) Therefore, in responding to Plaintiff's counsel's hypothetical, it "would be cutting it a little close" for a person to do this job if he could only perform fine motor skills for 50 percent of the day. (AR 50.) But such a person would be able to do the job if it did not require "constant" transcribing. (AR 50.) However, based on another hypothetical posed by Plaintiff's counsel, Sinclair further testified that such an individual would be unable to sustain the job of transcriber if he missed four or more days of work per month because of pain limitations. (AR 50-51.)

At step four, Plaintiff must show that he does not have the residual functional capacity to engage in "past relevant work" 20 C.F.R. §§ 404.1529(e) & 416.920(e). The ALJ may properly limit a hypothetical to include only the impairments grounded in substantial evidence. Britton v. Colvin, 787 F.3d 1011, 1013 (9th Cir. 2015). Plaintiff claims that he has significant limitations in his small motor skills and can only type 4-6% of the requirements of a job, (Dkt. No. 28 at 2), which does not correlate to the hypothetical posed to the vocational expert that he can transcribe 50% of the job requirement. However, because the ALJ rejected the pain and symptom testimony of Plaintiff concerning the intensity, persistence and limiting effects of the symptoms, the hypothetical did not have to include his subjective allegations of limitations of his small motor skills.

Moreover, the medical records do not support Plaintiff's allegation of small motor skill limitations or pain. After his left elbow surgery in July 2007, the medical records show that his elbow improved with each visit and it was noted that he was healing well and that he had full range of motion in his fingers and wrists. (AR 327-30.) During Dr. Sabourin's visit, Plaintiff claimed his elbow was doing "relatively

1 well" but he gets "some pain" after typing more than 20 minutes but he gets no
2 treatment for his problems. (AR 344.)  Dr. Sabourin noted that Plaintiff's left elbow
3 was not too significant of a problem and he could perform gross manipulations. (AR
4 348.)  Plaintiff has not provided any medical records to support his small motor skills
5 limitations.

6 　　　Moreover, Plaintiff claims that he was disabled in July 2007 when he was injured
7 and had surgery on his left elbow which was prior to the date he was last insured.
8 However, he must also demonstrate continuous disability through the date of his
9 application.  The medical records demonstrate that after surgery, his elbow condition
10 improved over time and no significant limitations were noted by his treating orthopedic
11 surgeons or the examining physicians.  Plaintiff has not demonstrated that he does not
12 have the RFC to engage in his past work as a transcriber/stenographer.

13 **F.    Plaintiff's Motion to Exclude Evidence**

14 　　　Plaintiff asks the Court to exclude expert testimony of the non-treating,
15 examining physicians for failing to meet the <u>Daubert</u>[6] standard.  (Dkt. No. 30.)
16 Defendant contends that <u>Daubert</u> and the Federal Rules of Evidence do not apply in
17 a review of administrative proceedings.

18 　　　The Federal Rules of Evidence and <u>Daubert</u> do not apply to administrative
19 hearings in a Social Security case.  <u>Bayliss v. Barnhart</u>, 427 F.3d 1211, 1217 (9th Cir.
20 2005) (explaining that Rule 702 and a <u>Daubert</u> analysis of the reliability of experts does
21 not apply in Social Security administrative proceedings); <u>see also Crane v. Barnhart</u>,
22 224 Fed. App'x 574, 578 (9th Cir. 2007); <u>Howard v. Astrue</u>, 330 Fed. App'x 128, 131
23 (9th Cir. 2009) (plaintiff's argument that VE's testimony was inadmissible under
24 <u>Daubert</u> is foreclosed by <u>Bayliss</u>).  Based on Ninth Circuit law, the Court ADOPTS the
25 Report and DENIES Plaintiff's motion to exclude the non-treating examining
26 physician's reports.

27 **G.    Plaintiff's Ex parte Request to Supplement the Administrative Record**

28 　　　　　　[6]<u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993).

Plaintiff filed an ex parte request seeking to supplement the administrative record with x-ray images from his knee injury in August 2002 and elbow injury in July 2007. (Dkt. No. 17.)  He claims that he signed releases to have them included as part of the record but they were not although he acknowledges that x-ray reports were provided in the record.  (Dkt. No. 28 at 1.)  He alleges he did not know they were not included until he reviewed the record presented during this case.  (Id. at 2.)  He seeks to add the x-rays because it would be clearly visible to the Court that his leg is bent near 10 degrees and not 2 degrees as Dr. Sabourin assessed.  (Dkt. No. 28 at 3.)  In another filing, Plaintiff also seeks to supplement the record with his most recent doctor's visit in April/May 2016 to include x-rays images without any identification information, and an MRI scan report dated February 2016.  (Dkt. No. 19.)

"As part of the Commissioner's answer the Commissioner of Social Security shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based.  The court shall have power to enter, upon the pleadings and transcript of the record, judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for rehearing."  42 U.S.C. § 405(g).  The district court's review is limited to a review of the administrative record.  See Mathews v. Weber, 423 U.S. 261, 263 (1965); Harman v. Apfel, 211 F.3d 1172, 1177 (9th Cir. 2000).

When new evidence that is not part of the administrative record is presented for the first time to the district court, § 405(g) allows the court to remand the case to the Social Security Administration for consideration if, and only if there is "a showing" that the new evidence is "material" and that there is "good cause for the failure to incorporate such evidence into the record in a prior proceeding. . . ." 42 U.S.C. § 405(g); Orteza v. Shalala, 50 F.3d 748, 751 (9th Cir. 1994) ("We will remand for the consideration of new evidence when the evidence is material and the claimant establishes good cause for failing to submit the evidence during the administrative proceedings.")

[16CV0215-GPC(KSC)]

"Good cause" exists if the claimant can provide a reasonable explanation as to why new evidence was unavailable earlier. Mayes v. Massanari, 276 F.3d 453, 463 (9th Cir. 2001). "A claimant does not meet the good cause requirement by merely obtaining a more favorable report once his or her claim has been denied." Id. Without more, a simple assertion "that the evidence only turned up later" is also not enough to satisfy the "good cause" standard. Clem v. Sullivan, 894 F.2d 328, 332 (9th Cir. 1990).

New evidence is "material" if there is a reasonable possibility that it would have changed the outcome of the claim for disability benefits. Booz v. Sec'y of Health and Human Servs., 734 F.2d 1378, 1380-1381 (9th Cir. 1984). The new evidence must be probative of the claimant's condition as it existed during the relevant time period and prior to the disability hearing. Sanchez v. Sec'y of Health and Human Servs., 812 F.2d 509, 511-512 (9th Cir. 1987). In Sanchez, the Ninth Circuit concluded that the claimant's new evidence was not material because "at most, [it showed] deterioration after the hearing, which would be material to a new application but not probative of [the claimant's] condition at the hearing." Id. at 512.

Plaintiff has not demonstrated good cause for his failure to include the x-ray images as part of the administrative record. His counsel did not object to the state of the record during the administrative proceedings. Plaintiff's assertion that a lay person, including the Court, would be able to view the x-ray images and determine the degree of his varus and determine whether the varus degree would lead to a conclusion that he is disabled is not compelling as the Court and the ALJ are not qualified to interpret raw medical data. See Padilla v. Astrue, 541 F. Supp. 2d 1102, 1106 (C.D. Cal. 2008) (quoting Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam), and citing Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975)); see also Manso-Pizarro v. Secretary of Health and Human Servs., 76 F.3d 15, 17 (1st Cir. 1996) ("With a few exceptions . . . an ALJ, as a layperson, is not qualified to interpret raw data in a medical record."). However, notwithstanding his request, the x-ray reports are part of the record and were reviewed by the treating doctors in his case; therefore, the x-ray

1   images are not material as they would not change the outcome of the administrative

2   proceeding.  (AR 312-315, 317, 320, 321, 322 ("still moderate varus at the jointline but

3   it is unchanged from the previous radiographs"), 323, 324 ("varus alignment of the

4   proximal tibia is unchanged."), 325 ("There is still a little varus at the proximal

5   fragment, but this is unchanged from the original x-rays." ), 326, 327, 328.)

6        Second, the 2016 medical records are submitted two years after his

7   administrative hearing, they are not material to his condition at the time of the hearing.

8   See Sanchez, 812 F.2d at 512.  Accordingly, the Court ADOPTS the Report and

9   DENIES Plaintiff's ex parte motion to supplement the record.

10                        **Conclusion**

11        Based on the foregoing review of the relevant law and the administrative record,

12   the Court finds that the Administrative Law Judge applied the correct legal standards

13   when he denied Plaintiff's claim and that his conclusions are supported by substantial

14   evidence. Therefore, the Court ADOPTS the Report in full and DENIES Plaintiff's

15   Motion for Summary Judgment and GRANTS Defendant's Cross-Motion for Summary

16   Judgment. The Court also DENIES Defendant's motion for involuntary dismissal,

17   DENIES Plaintiff's motion to exclude evidence and DENIES Plaintiff's ex parte

18   request to supplement the administrative record.  The Clerk of Court shall close the

19   case.

20        IT IS SO ORDERED.

21

22   DATED:  March 27, 2017

23

24   HON. GONZALO P. CURIEL
     United States District Judge

25

26

27

28

[16CV0215-GPC(KSC)]